1   LERACH COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2   SHAWN A. WILLIAMS (213113)
  MONIQUE C. WINKLER (213031)
3   AELISH M. BAIG (201279)
  100 Pine Street, Suite 2600
4   San Francisco, CA 94111
  Telephone: 415/288-4545
5   415/288-4534 (fax)
  swilliams@lerachlaw.com
6   mwinkler@lerachlaw.com
  abaig@lerachlaw.com
7
  Lead Counsel for Plaintiffs
8   [Additional counsel appear on signature page.]

9            UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
10               SAN JOSE DIVISION

| 11 | In re KLA-TENCOR CORP. SHAREHOLDER DERIVATIVE LITIGATION | ) ) | No. C-06-03445-JW |
|---|---|---|---|
| 12 | ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) ) | AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE |
| 13 | This Document Relates To: | ) ) | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND |
| 14 | ALL ACTIONS. | ) ) | STATE LAW CLAIMS FOR BREACH OF FIDUCIARY DUTY, ABUSE OF |
| 15 | ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ALASKA ELECTRICAL PENSION FUND, | ) ) | CONTROL, CONSTRUCTIVE FRAUD, CORPORATE WASTE, UNJUST |
| 16 | Derivatively on Behalf of KLA-TENCOR CORPORATION, | ) ) | ENRICHMENT, GROSS MISMANAGEMENT, ACTION FOR |
| 17 | Plaintiff, vs. | ) ) | ACCOUNTING AND VIOLATION OF CALIFORNIA CORPORATIONS CODE |
| 18 | KENNETH LEVY, KENNETH L. | ) ) | |
| 19 | SCHROEDER, RICHARD P. WALLACE, JOHN H. KISPERT, JEFFREY L. HALL, JON | ) ) | |
| 20 | D. TOMPKINS, LIDA URBANEK, H. RAYMOND BINGHAM, ROBERT J. | ) ) | |
| 21 | BOEHLKE, ROBERT T. BOND, EDWARD W. BARNHOLT, STEPHEN P. KAUFMAN, | ) ) | |
| 22 | RICHARD J. ELKUS, JR., ARTHUR SCHNITZER, GARY DICKERSON, STUART | ) ) | |
| 23 | NICHOLS and LEO CHAMBERLAIN, | ) ) | |
| 24 | Defendants, – and – | ) ) | |
| 25 | KLA-TENCOR CORPORATION, a Delaware corporation, | ) ) | |
| 26 | Nominal Defendant. | ) ) | |
| 27 | ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | DEMAND FOR JURY TRIAL |

28

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought by Alaska Electrical Pension Fund, a shareholder of KLA-Tencor Corporation ("KLA-Tencor" or the "Company"), on behalf of the Company against its Board of Directors ("Board") and certain of its current and former senior executives (collectively, "Defendants").[1]  This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants allowed senior KLA-Tencor insiders to divert hundreds of millions of dollars of corporate assets to themselves via the manipulation of grant dates associated with hundreds of thousands of stock options granted to KLA-Tencor insiders.  During the period between 1995 and the present (the "Relevant Period"), each of the Defendants also participated in the concealment of the option backdating scheme complained of herein and/or refused to take advantage of the Company's legal rights to require these senior insiders to disgorge the hundreds of millions of dollars in illicitly obtained incentive compensation and proceeds diverted to them since 1995.

2.      During the Relevant Period, Defendants also caused KLA-Tencor to issue and file false and misleading statements with the Securities and Exchange Commission ("SEC"), including Proxy Statements filed with the SEC.

3.      The action seeks to remedy Defendants' violations of federal and California state law, including the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated therein and §14(a) of the Exchange Act, Cal. Corp. Code §§25402 and 25502.5, as well as breaches of fiduciary duties, abuse of control,

---

[1]      The "Individual Defendants" are Kenneth Levy ("Levy"), Kenneth L. Schroeder ("Schroeder"), Richard P. Wallace ("Wallace"), John H. Kispert ("Kispert"), Jeffrey L. Hall ("Hall"), Jon D. Tompkins ("Tompkins"), Lida Urbanek ("Urbanek"), H. Raymond Bingham ("Bingham"), Robert J. Boehlke ("Boehlke"), Robert T. Bond ("Bond"), Edward W. Barnholt ("Barnholt"), Stephen P. Kaufman ("Kaufman"), Richard J. Elkus, Jr. ("Elkus"), Arthur Schnitzer ("Schnitzer"), Gary Dickerson ("Dickerson"), Stuart Nichols ("Nichols") and Leo Chamberlain ("Chamberlain").

1    gross mismanagement, constructive fraud, waste of corporate assets, and unjust enrichment between

2    1995 and the present.

3              4.      Plaintiffs demand an accounting of all stock option grants made to Defendants during

4    times relevant hereto, the rescission of all contracts which provide for stock option grants between

5    any of the Defendants and KLA-Tencor, which were entered into during times relevant hereto, and a

6    declaration that the illicit stock options, and all proceeds derived from exercise thereof, are and have

7    been held in constructive trust for the Company's benefit.

8              5.      During the Relevant Period, the Company's executives and its non-employee

9    directors were compensated in large part through the issuance of stock options. A stock option

10   granted to an employee and/or director of a corporation allows the employee and/or director to

11   purchase company stock at a specified price – referred to as the "exercise price," typically the fair

12   market value of the stock on the date the option is granted.  When properly issued, stock options

13   serve as a valuable part of employee and/or director compensation packages as a means to create

14   incentives to boost profitability and stock value.  When the employee and/or director exercises the

15   option, he or she purchases the stock from the company at the exercise price, regardless of the

16   stock's price at the time the option is exercised.

17             6.      Dating back to at least 1996, the Defendants engaged in a scheme and course of

18   conduct designed to manipulate KLA-Tencor stock option grant dates so as to secretly maximize

19   profits to themselves and other Company executives at the expense of the Company and its

20   shareholders.  Specifically, the Defendants, the Board and senior officers at the Company approved

21   the granting of backdated/misdated stock options in abdication of their fiduciary duties.

22             7.      "Backdating"[2] is a practice by which a stock option is reported as having been

23   granted on one date, but is actually backdated weeks or months to a date where the stock price was

24   trading at a lower price.  Such backdating allows company executives and stock option grantees to

25   _____

26   [2]      Plaintiffs' use of the terms "backdating," "misdating," "backdated" and "misdated"
     throughout this Complaint may also refer to other forms of related stock option manipulation
27   perpetrated by Defendants alleged in this action.

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW      - 2 -

1   realize immediate unearned and undisclosed financial gains at the expense of the company's

2   shareholders.  Backdating of stock option grants has been compared to picking lottery numbers on

3   the day after the winning numbers are announced, or betting on a horse after the race has finished.

4   Arthur Levitt, a former chairman of the SEC was quoted as stating that stock option backdating

5   "represents the ultimate in greed."  Further, Levitt stated, "It is stealing, in effect.  It is ripping off

6   shareholders in an unconscionable way." On May 5, 2006, President George W. Bush stated in an

7   interview on the Kudlow & Company show airing on CNBC that "overcompensating or trying to

8   backdate things is bad for America, and there ought to be consequences when people don't tell the

9   truth and are not transparent."

10          8.      In addition, former SEC Chairman Harvey Pitt recently opined that the backdating of

11   stock options often involves the falsification of documents for personal gain:

12          Many discussions of backdating options start with the observation that backdating is
            not, per se, illegal.   That is wrong.   ***Options backdating frequently involves***
13          ***falsification of records used to gain access to corporate assets***.  ***That conduct***
            ***violates the Foreign Corrupt Practices Act and its internal controls requirements***.
14          ***If corporate directors were complicit in these efforts, state law fiduciary obligations***
            ***are violated***. Backdating is not only illegal and unethical, it points to a lack of
15          integrity in a company's internal controls.

16          9.      Furthermore, backdating stock options creates an instant paper gain to grantees who

17   receive them because the options were priced below the stock's fair market value when they were

18   actually awarded.  Under Generally Accepted Accounting Principles ("GAAP"), this instant paper

19   gain is equivalent to paying extra compensation and thus is a cost to KLA-Tencor.  Accordingly,

20   KLA-Tencor was required to record an expense to its financial statements for any options granted

21   below the fair market value on the grant date of the option, or "in the money" options.  However, the

22   Defendants did not properly record these known costs on KLA-Tencor's financial statements,

23   causing KLA-Tencor's financial statements throughout the Relevant Period to be issued in violation

24   of GAAP.  Specifically, these financial statements overstated reported earnings and understated

25   reported expenses.

26          10.     In addition to Defendants' clear breach of fiduciary duty and violation of accounting

27   rules, Defendants' backdating of stock options may have extremely serious tax consequences for the

28   Company.  While stock options generally qualify for favorable tax treatment, options issued at a

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW      - 3 -

1    discount to the market price do not qualify for that treatment.  Accordingly, backdated stock options

2    are automatically disqualified from that favorable tax relief, and KLA-Tencor has now

3    acknowledged that it may owe millions of dollars in unpaid taxes.

4         11.      Defendants' conduct has already had severe consequences on the Company's

5    available assets and the credibility of its Board and executive leadership.  The disruption to the

6    Company's business is and will continue to be immeasurable until the ongoing regulatory

7    investigations are complete, and the Company restates its many false and misleading financial

8    statements.  Further, the Company is now the target of investigations by the SEC and the Department

9    of Justice ("DOJ") and is exposed to severe civil and criminal liability, including Internal Revenue

10    Service ("IRS") fines and back taxes.

11         12.      Apart from the knowing issuance of false and misleading representations in financial

12    reports, Defendants misrepresented facts presented in Form 14-A Proxy Statements soliciting action

13    by Company shareholders, and in press releases and documents filed with the SEC, specifically

14    quarterly and year-end reports.

15         13.      For example, throughout the Relevant Period, the Company described the purpose

16    and philosophy of the stock option and incentive program as necessary to align the long term

17    interests of executives with the that of the stockholders:

18        The goals of the Company's compensation policy are to attract, retain and reward

19        executive officers who contribute to the overall success of the Company by offering compensation that is competitive in the industry, to motivate executives to achieve

20        the Company's business objectives and to align the interests of officers with the long term interests of stockholders.  The Company currently uses salary, a management

21        incentive plan, and stock options to meet these goals.

22         14.      The Company also repeatedly and falsely represented that because stock options were

23    granted at market price on the date of the grant or fair market value on the date of the stock option

24    grants, the options only became valuable as the share price increased from the price on the date of

25    the grant:

26

27

28

1      *Stock options are granted at market price on the date of grant and will provide*
    *value to the executive officers only when the price of the Company's Common*
2      *Stock increases over the exercise price.*[3]

3         15.     During the Relevant Period, Defendants also caused the Company to falsely state that

4  it properly accounted for stock option issuance in accordance with Accounting Principles Board

5  ("APB") Opinion No. 25 as follows:

6      Stock-Based Compensation Plans

7      *The Company accounts for its stock option plans and employee stock purchase*
    *plan in accordance with provisions of the Accounting Principles Board's Opinion*
8      *No. 25 (APB OPINION NO. 25), "Accounting for Stock Issued to Employees."*
    *The Company's policy is to grant options at the fair market value on the date of*
9      *grant. Accordingly no compensation expense has been recorded.*

10         16.     Defendants also assured shareholders that the issuance of stock options and their

11  exercise would be in compliance with all applicable federal, state and foreign law with respect to the

12  securities at issue:

13      COMPLIANCE WITH SECURITIES LAW.  The grant of Options and the issuance
    of shares of Stock upon exercise of Options shall be subject to compliance with all
14      applicable requirements of federal, state or foreign law with respect to such
    securities.

15         17.     At the same time that Defendants knowingly caused the Company to make these false

16  and misleading statements, Defendants knew but failed to disclose that the practices employed by the

17  Board allowed the stock option grants to be manipulated or ***backdated*** to dates when the Company's

18  shares were trading at or near the lowest price for that Relevant Period.  By May 2006, Defendants'

19  backdating scheme had yielded stock option grants to the Company's executive officers worth

20  millions of dollars.

21         18.     In order to conceal the falsity of the Company's financial statements, representations

22  of the adequacy of its internal controls, and the fraudulent issuance and manipulation of the

23  Company's stock option grants, Defendants, through key executives and the Board's Compensation

24

25  _____

26  [3]     During the Relevant Period the Company issued stock options under several different stock
option plans, including the 1982 Stock Option Plan, the 1990 Stock Option Plan, the 1993 Employee
27  Incentive Stock Option Plan, the 1998 Outside Director Stock Option Plan, the 2004 Equity
Incentive Plan and the 2000 Non-Statutory Plan (hereinafter "Stock Option Plans").

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW   - 5 -

and Audit Committees, falsely assured shareholders that financial statements and associated representations were accurate. Indeed, during the Relevant Period, Defendants Schroeder and Kispert each claimed that they had investigated and reviewed the Company's financial statements and internal control processes and authorized their inclusion in the Company's public filings. Between 2002 and 2005, both Schroeder and Kispert signed false certifications pursuant to Sarbanes-Oxley §§302 and 906. For example, Schroeder's Sarbanes-Oxley certification filed with the Company's 2004 Form 10-K affirms:

> I, Kenneth L. Schroeder certify that:
>
> 1.      I have reviewed this annual report on Form 10-K of KLA-Tencor Corporation;
>
> 2.      Based on my knowledge, **this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;
>
> 3.      **Based on my knowledge, the financial statements**, and other financial information included in this report, **fairly present in all material respects the financial condition, results of operations** and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.      **The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules** 13a-15(e) and 15d-15(e)) for the registrant **and have**:
>
> > a.      **designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated** subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > b.      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
> >
> > c.      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over the financial reporting; and
>
> 5.      **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the**

*registrant's auditors and the audit committee* of the registrant's board of directors (or persons performing the equivalent functions):

    a.    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

19.    In fact, however, Defendants knew and failed to disclose that for years, the Company, its senior executives and members of the Board, had been engaging in a continuing scheme and course of conduct of backdating or misdating stock option grants to themselves and other executives in a manner designed to create immediate and risk free profits in direct contravention of the Company's stated and shareholder approved stock option plans and Proxy Statements.

20.    Furthermore, Defendants knew that because the Company had not taken a compensation expense for backdated options required by APB Opinion No. 25, KLA-Tencor reported earnings and expenses were false and misleading and not in compliance with GAAP. Thus, by falsifying the date on which options were granted, Defendants materially understated KLA-Tencor expenses, overstated its income and falsely represented that it had not incurred any expenses for option grants.

21.    Defendants' misrepresentations and wrongful course of conduct violated the Exchange Act, as well as California and Delaware law. By authorizing and/or acquiescing in the stock option backdating scheme, Defendants: (a) caused KLA-Tencor to issue false statements; (b) diverted hundreds of millions of dollars of corporate assets to themselves and KLA-Tencor executives; and (c) subjected KLA-Tencor to liability from regulators including the SEC, the IRS and federal prosecutors.

22.    Throughout the Relevant Period, however, Defendants knew but failed to disclose that stock option grants had been manipulated in order to create secret and risk-free profits to grant recipients, and that as a result, the Company repeatedly and materially overstated its net income and understated its expenses.

23.     Further, throughout the Relevant Period, Defendants knowingly and falsely assured shareholders that in addition to the certified internal controls, the Board had Compensation, Audit, and Nominating and Governance Committees in place to oversee the Company's compensation practices including stock option issuances, accounting practices and overall corporate governance policies.

### Compensation Committee

24.     During the Relevant Period, the Company made the following representations regarding the responsibilities of the Compensation Committee of the Board:

Compensation Committee

The Committee is comprised of three of the ***independent***, non-employee members of the Board of Directors, none of whom have interlocking relationships as defined by the Securities and Exchange Commission.  The Committee is responsible for setting and administering the policies governing annual compensation of executive officers, considers their performance and ***makes recommendations regarding their cash compensation and stock options to the full Board of Directors***.  The Committee periodically reviews its approach to executive compensation and makes changes as appropriate.

### Audit Committee

25.     During the Relevant Period, Defendants gave assurances with regard to the Audit Committee's practices in evaluating the Company's financial statements and that its outside auditors did a comprehensive review of the Company's audit practices before authorizing them to be included in public financial statements.  For example, set forth below is the Company's September 25, 2002 Audit Committee Report:

*During fiscal year 2002, the Audit Committee met with the senior members of the Company's financial management team, the Company's independent auditors and the Company's General Counsel when appropriate.  The Audit Committee also met separately with the Company's independent auditors and separately with the Company's Chief Financial Officer.  The parties candidly discussed financial management, accounting and internal controls.*

*                    *                    *

*The Audit Committee reviewed and discussed the audited financial statements included in the Company's Annual Report with the Companies management including, without limitation, a discussion of the quality and not just the acceptability of the accounting principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements as well as in Management's Discussion and Analysis of Results of Operations and Financial Condition*. . . .

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW      - 8 -

1

\* \* \*

2  Based on the reviews and discussions referred to above, the Audit Committee
recommended to the Board of Directors, and the Board of Directors approved, the
3  audited financial statements included in the Company's Annual Report for the fiscal
year ended June 30, 2002, filed with the Securities and Exchange Commission on
4  September 20, 2002.

5       26.     The following chart illustrates the Board committee memberships between 1998-

6  2005:

7                    **Members of the Committees of the Board of Directors**

| Year | Compensation | Audit | Nominating and Governance |
|------|--------------|-------|---------------------------|
| 1998 | James Bagley<br>Leo Chamberlain<br>Lida Rubanek | Dean Morton<br>Dag Tellefsen<br>Samuel Rubinovitz | Edward Barnholt<br>Kenneth Levy<br>Jon Tompkins |
| 1999 | James Bagley<br>Leo Chamberlain<br>Lida Urbanek | Richard Elkus, Jr.<br>Samuel Rubinovitz<br>Dag Tellefsen | Edward Barnholt<br>Kenneth Levy<br>Dean Morton |
| 2000 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Dean Morton<br>Richard Elkus, Jr.<br>Leo Chamberlain | Dean Morton<br>Kenneth Levy<br>Kenneth Schroeder<br>Edward Barnholt |
| 2001 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Raymond Bingham<br>Richard Elkus, Jr.<br>Dean Morton | Dean Morton<br>Kenneth Levy<br>Kenneth Schroeder<br>Edward Barnholt |
| 2002 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Raymond Bingham<br>Richard Elkus, Jr.<br>Dean Morton | Edward Barnholt<br>Kenneth Levy<br>Kenneth Schroeder |
| 2003 | Edward Barnholt<br>Robert Bond<br>Lida Urbanek | Raymond Bingham<br>Robert Bond<br>Richard Elkus, Jr.<br>Stephen Kaufman | Edward Barnholt<br>Richard Elkus |
| 2004 | Edward Barnholt<br>Robert Bond<br>Michael Marks<br>Lida Urbanek | Raymond Bingham<br>Robert Bond<br>Richard Elkus, Jr.<br>Stephen Kaufman | Edward Barnholt<br>Kenneth Levy<br>Kenneth Schroeder |
| 2005 | Edward Barnholt<br>Robert Bond<br>Michael Marks<br>Lida Urbanek | Raymond Bingham<br>Robert Bond<br>Richard Elkus, Jr.<br>Stephen Kaufman | Edward Barnholt<br>Richard Elkus<br>Stephen Kaufman |

24       27.     Finally, at the same time that Defendants were secretly issuing themselves and other

25  KLA-Tencor executives backdated stock options and falsifying the Company's financial statements,

the Insider Selling Defendants unloaded millions of shares of KLA-Tencor stock for a total of more than *$246 million* in insider trading proceeds:[4]

| DEFENDANT | DATES OF SALES | SHARES SOLD | PROCEEDS RECEIVED |
|---|---|---|---|
| BARNHOLT | 12/10/04 – 11/18/05 | 29,000 | $1,432,675 |
| BINGHAM | 11/22/05 | 5,000 | $263,100 |
| BOEHLKE | 8/1/97-3/3/00 | 352,400 | $14,136,330 |
| BOND | 09/13/05 | 5,000 | $253,050 |
| CHAMBERLAIN | 12/14/95 – 1/18/00 | 81,764 | $4,839,107 |
| ELKUS | 8/6/99 – 11/29/05 | 155,416 | $7,022,474 |
| HALL | 12/03/04 – 11/18/05 | 12,300 | $607,060 |
| KISPERT | 01/18/00 – 09/15/05 | 341,500 | $20,156,845 |
| LEVY | 04/30/96 – 02/27/06 | 2,285,651 | $111,476,225 |
| NICHOLS | 4//24/01 – 4/30/02 | 21,614 | $1,155,276 |
| SCHROEDER | 05/08/97 – 02/08/06 | 1,249,800 | $64,336,289 |
| SCHNITZER | 5/28/97-3/10/00 | 471,644 | $26,807,656 |
| TOMPKINS | 07/31/97 – 08/29/05 | 670,049 | $31,565,583 |
| URBANEK | 12/14/01 – 02/27/06 | 9,149 | $448,324 |
| WALLACE | 08/05/99 – 12/03/03 | 292,499 | $15,547,430 |
| TOTAL | | 5,003,326 | $259,103,438 |

**Illegal Backdating Forces KLA-Tencor to Restate Years of Financial Statements**

28.     On May 16, 2006, the Center for Financial Research and Analysis issued a report: "Options Backdating – Which Companies Are at Risk?"  The report also identified the risks for companies that have taken part in options backdating:

• SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosure around all areas of executive compensation.

• Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

• Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

• Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholders, the reputation of management (and the related stock premium for superior management) could take a hit.

---

[4]     The "Insider Selling Defendants" are Barnholt, Bingham, Boehlke, Bond, Chamberlain, Elkus, Hall, Kispert, Levy, Nichols, Schroeder, Schnitzer, Tompkins, Urbanek, and Wallace.

29.     On May 22, 2006, *The Wall Street Journal* reported that KLA-Tencor had shown questionable patterns surrounding the timing of option grants to its executives.  Later the same day, it was disclosed that U.S. federal prosecutors were investigating executive stock option grants at KLA-Tencor.  These disclosures caused KLA-Tencor's stock to close down $4.70 per share on extremely high volume at $40.54 on May 22, 2006 – a one day decline of 10.4%.

30.     On May 24, 2006, the Company announced that it had received subpoenas from the United States Attorneys' Offices in New York and California.  In addition, the Company had formed a Special Committee of "independent" directors to investigate the timing of stock option grants between 1995-2001:

> **KLA-Tencor Announces Formation of Special Committee to Investigate Stock Option Practices**
>
> SAN JOSE, Calif., May 24, 2006 – KLA/Tencor Corporation (NASDAQ: KLAC) today announced that its Board of Directors has appointed a special committee of independent directors to conduct an internal investigation relating to past stock options granted to employees during the 1995 to 2001 timeframe.  The special committee is investigating the timing of such grants and related accounting and documentation and will be assisted by outside legal counsel and accounting experts.
>
> KLA-Tencor also said that it has received subpoenas from the U.S. Attorney's Offices for the Eastern District of New York and Northern District of California requesting information related to its past stock option grants. . . .

31.     As a result of the sharp decline in KLA-Tencor's stock price due to its involvement in the ongoing option granting scandal, KLA-Tencor was forced to renegotiate its deal to acquire ADE Corporation ("ADE").  On May 26, 2006, the Company announced that it had amended a merger agreement it had previously entered into with ADE to acquire ADE in a stock-for-stock transaction valued at approximately $488 million.  Under the agreement, KLA-Tencor would issue 0.64 share of KLA-Tencor per one share of ADE.  This calculation was based upon the closing price of KLA-Tencor stock for February 22, 2006 of $51.73.  Due to the sharp decline in the value of KLA-Tencor's stock, KLA-Tencor was forced to change the terms of its agreement with ADE into an all-cash transaction instead of a stock-for-stock transaction.  On May 26, 2006, KLA-Tencor announced that it had amended its agreement with ADE from a stock-for-stock transaction to an all-cash transaction and that it had agreed to pay $32.50 *in cash* per share of ADE stock.  KLA-Tencor's stock closed at $40.62 per share on May 26, 2006 – a 21.5% decline from February 22, 2006.

32.     On May 30, 2006, KLA-Tencor announced that it received notice from the SEC of an informal inquiry relating to past stock option grants.

33.     On June 30, 2006, KLA-Tencor issued a press release to report the preliminary conclusion of its Special Committee with respect to its ongoing internal investigation relating to past stock option grants, the timing of such grants and related accounting and documentation.  The preliminary report found that the measurement date for certain option grants indeed likely differed from the recorded date of the grants.  The Company further indicated that it would likely have to restate its financials to correct improperly reported compensation expenses.

> [A] ***Special Committee of the Company's Board of Directors has reached a preliminary conclusion that the actual measurement dates for financial accounting purposes of certain stock option grants issued in prior years likely differ*** from the recorded grant dates of such awards.  The Special Committee has not completed its investigation and is continuing its review of these matters.  The Special Committee has not yet determined whether any resulting compensation charges are material or whether the Company ultimately will restate previously issued financial statements.
>
> The Company previously announced that its Board of Directors has appointed a Special Committee of independent directors to conduct an internal investigation relating to stock options granted to members of senior management and the employees of the Company.  The Special Committee, assisted by independent legal counsel and accounting experts, is investigating the timing of such grants, as well as their related accounting treatment.
>
> ***Based on the Special Committees investigation to date, the Company now anticipates that it may record additional non-cash charges for stock-based compensation expense.***  The Company has not yet determined the amount of such charges or the resulting tax impact of these actions.  ***In the event that the Company determines that these items are material, KLA-Tencor may be required to restate its financial statements for the relevant prior fiscal periods***.

34.     On July 27, 2006, KLA-Tencor issued a press release announcing that as a result of the on-going internal investigation relating to stock option grants previously disclosed on May 24, 2006, the Company would be unable to provide detailed GAAP financials for items other than revenue and bookings for the quarter or year ended June 30, 2006.  The Company also disclosed that it would not file its annual report on Form 10-K.

35.     On September 14, 2006, the Company announced that it received a NASDAQ Staff Determination notice indicating that the Company is not in compliance with the filing requirements for continued listing as set forth in NASDAQ Marketplace Rule 4310(c)(14) and that its common stock is subject to delisting from the NASDAQ Global Select Market:

1    **KLA-Tencor Delays Filing Form 10-K and Receives Notice from Nasdaq**

2                                    *        *        *

3    As a result of the delayed filing of the Company's Form 10-K, the Company today
     received a NASDAQ Staff Determination notice indicating that the Company is not
4    in compliance with the filing requirements for continued listing as set forth in
     NASDAQ Marketplace Rule 4310(c)(14) and that its common stock is subject to
5    delisting from the NASDAQ Global Select Market. . . .

6        36.    On September 28, 2006, the Company issued a press release stating that it would

7    restate publicly reported financial statements due to the backdating/misdating of stock options and

8    that all of its financial statements issued since July 1997 should no longer be relied upon.  Moreover,

9    the Company stated that its restatement could reduce previously reported net income and increase

10   previously reported losses during the Relevant Period:

11       **KLA-Tencor Will Restate Financial Statements Related to Stock Options**

12   *SAN JOSE, Calif., September 28, 2006 -- KLA-Tencor Corporation (NASDAQ:*
     *KLAC) today announced that it will restate* previously issued financial statements to
13   correct the Company's past accounting for stock options.  Based on a report received
     from a Special Committee of the Board of Directors, *the Board concluded that*
14   *incorrect measurement dates for certain stock option grants were used for*
     *financial accounting purposes, principally during the periods July 1, 1997 through*
15   *June 30, 2002.  As a result, the Company will be required to record non-cash*
     *charges for compensation expenses relating to those past stock option grants.*
16
     The Company has not determined the exact amount of such charges, the resulting tax
17   and accounting impact, or which specific reporting periods may require restatement.
     *Accordingly, the Company is filing a Form 8-K today stating that the financial*
18   *statements and all earnings and press releases and similar communications issued*
     *by the Company relating to periods beginning on or after July 1, 1997, should no*
19   *longer be relied upon.  KLA-Tencor intends to file its restated financial results and*
     *Annual Report on Form 10-K as quickly as practicable.*
20
     KLA-Tencor does not anticipate that the restatement will have any impact on the
21   Company's historical revenues. *Any stock-based compensation charges incurred as*
     *a result of the restatement would have the effect of decreasing reported income or*
22   *increasing reported loss from operations, and decreasing reported net income or*
     *increasing reported net loss, and decreasing reported retained earnings amounts*
23   *contained in the Company's historical financial statements for the affected*
     *periods.*
24
         37.    On October 3, 2006, the Company filed a Form 8-K with the SEC further detailing
25
     the findings of the Special Committee and specifically stating that the measurement dates and the
26
     grant dates for stock options issued during the Relevant Period materially differed and the Company
27
     would indeed restate seven years of financial statements:
28

A Special Committee of the Board of Directors of KLA-Tencor Corporation (the "Company") has delivered a report to the Board of Directors, which concluded that incorrect measurement dates were used for certain stock option grants made principally during the period from July 1, 1997 through July 30, 2002. The Board of Directors of the Company has not concluded its evaluation of the factors that led to the use of incorrect measurement dates of stock options. The Board of Directors has concluded that the Company will need to restate certain of its historical financial statements to record non-cash charges for compensation expenses relating to past stock option grants. **The Company has not determined the amount of such charges, the resulting tax and accounting impacts, the impact on internal control over financial reporting, or which specific periods may require restatement. However, the effects on previously reported financial statements are expected to be material**. The Special Committee and the Board of Directors will continue to be actively involved in reviewing information and determining the appropriate actions to be taken by the Company with respect to this matter.

**Accordingly, on September 27, 2006, the Board of Directors concluded that financial statements and all earnings and press releases and similar communications issued by the Company relating to periods beginning on or after July 1, 1997**, should no longer be relied upon, including the Company's financial statements for fiscal **years 1998 through 2005, the interim periods contained therein, and the fiscal quarters ended** September 30, 2005, December 31, 2005 and March 31, 2006. The Company's management and the Special Committee have discussed this matter with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm.

38.    The same Form 8-K stated that the Company had taken steps to restrict or freeze the exercise and sale of any stock options during the period that the investigation was ongoing and imposing a "blackout" period on the acquisition of any shares under the stock option plans.

On September 27, 2006, KLA-Tencor Corporation (the "Company") determined that its historical financial statements for one or more prior fiscal years will have to be restated as a result of improper accounting for option grants made to officers and employees. **The specific fiscal years which will need to be restated has yet been determined. However, the Company has decided to suspend temporarily employee participation in several equity incentive programs because the S-8 registration statements covering the shares of common stock issuable under those programs incorporate one or more financial statements that will likely have to be restated.** As part of such suspension, participants in the Company's 401(k) Plan (the "401(k) Plan") will be subject to a blackout period during which they will be precluded from acquiring shares of the Company's common stock under that plan.

39.    On October 16, 2006, the Company announced that the Special Committee's investigation had concluded that the Company would have to restate a **whopping $400 million in compensation expense**. Moreover, the Company specifically implicated defendant Schroeder in the scheme, terminating all relationships with Schroeder immediately. Schroeder had been the Company's President and Chief Operating Officer ("COO"), Chief Executive Officer ("CEO") and a member of the Board between 1995-2005. The Company also fired its General Counsel, defendant

1   Nichols.   In addition, the Company canceled all backdated stock options held by defendant

2   Schroeder and repriced options held by Nichols:

3       **KLA-Tencor Announces Results of Special Committee Investigation of
        Historical Stock Option Practices**

4

5       Stock-Based Compensation Expenses Not Expected to Exceed $400 Million

6       SAN JOSE, California, October 16, 2006 KLA -- Tencor Corporation (NASDAQ:
        KLAC) today announced that the Special Committee investigation of the Company's
        historical stock option practices has been substantially completed.  As previously

7       announced, the Company's Board of Directors concluded that incorrect measurement
        dates for certain stock option grants were used for financial accounting purposes,

8       principally during the period July 1, 1997 through June 30, 2002, and as a result, the
        Company will restate its financial statements to correct the accounting for

9       retroactively priced stock options.  ***The Company now anticipates that the total
        additional non-cash charges for stock-based compensation expenses will not***

10      ***exceed $400 million***.

11      ***As a result of the investigation, the Company has terminated all aspects of its
        employment relationship with Kenneth L. Schroeder, effective immediately.***

12      ***Mr. Schroeder was President and Chief Operating Officer of the Company from
        1991 to 1999 and Chief Executive Officer and a member of the Board of Directors***

13      ***from 1999 through 2005***.

14      ***The Company also announced that its General Counsel, Stuart J. Nichols, has
        resigned, effective immediately.  Mr. Nichols had been Vice President and General***

15      ***Counsel of the Company since 2000***. . . .

16      ***The Company further announced its intention to cancel all outstanding
        retroactively priced stock options held by Mr. Schroeder and to re-price all***

17      ***outstanding retroactively priced stock options held by Mr. Nichols.  The exercise
        price of each re-priced option will be increased to the fair market value on the***

18      ***corrected measurement date***.

19          40.     The Company also indicated that it had found no wrongdoing by current members of

20   management (though Levy simultaneously "retired"), but repriced options held by Kispert because

21   he was the Chief Financial Officer ("CFO") during the Relevant Period and likely received

22   backdated stock options.

23      Based on the Special Committee's investigation, the Board of Directors concluded
        that there was no involvement in the improper stock option practices by any current

24      members of Company management, including Richard P. Wallace, John H. Kispert
        and Jeffrey L. Hall, who became Chief Executive Officer, Chief Operating Officer

25      and Chief Financial Officer, respectively, in early 2006.  ***Although the Board of
        Directors concluded that Mr. Kispert was not involved in the improper stock option***

26      ***practices, based on the Special Committee's recommendation, his outstanding
        retroactively priced options will be re-priced*** (in the manner described above)

27      because he served as Chief Financial Officer during part of the period in question.
        While the Company is evaluating whether the factors that led to the restatement

28      constituted a material weakness as of June 30, 2006, ***the Company believes that it***

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 15 -

*has in place the necessary internal controls to ensure proper accounting for stock options going forward.*

The Special Committee will now concentrate its efforts on assisting the Company's management with the restatement of the Company's affected financial statements. The restatement process is well underway, and the Company will continue to work diligently to determine the exact amount of additional non-cash charges for stock-based compensation expenses, the resulting accounting and tax impact, and the specific prior periods requiring restatement, and to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2006, as well as other required reports, as soon as practicable.

41.     On October 17, 2006, the Company announced additional executive departures due to the options backdating scandal, specifically, the Company's long-time Chairman of the Board and founder, defendant Levy.  The Company further admitted that defendant Levy also received backdated stock options and that the Company would reprice stock options that he received as part of the scheme:

**KLA-Tencor Announces Retirement of Board Chairman Kenneth Levy**

\*          \*          \*

SAN JOSE, California, October 17, 2006 -- KLA-Tencor Corporation (NASDAQ: KLAC) today announced that Kenneth Levy, Founder and Chairman of the Board, has informed the Company that he is retiring as a Director and employee, effective immediately.  Mr. Levy was a member of the Board of Directors of the Company since 1975, Chairman of the Board since 1999, and Chief Executive Officer from 1975 to 1997 and from mid 1998 to mid 1999.

\*          \*          \*

*The Company separately announced results of the investigation by the Special Committee of the Board of Directors of the Company's historical stock option practices.  Based upon that investigation, the Company intends to re-price all outstanding retroactively priced options by Mr. Levy and certain other former and current executives of the Company.  The exercise price of each re-priced option will be increased to the fair market value on the corrected measurement date.*

42.     On November 15, 2006, the Company announced that it was still unable to file its financial statements and had received yet another notice from NASDAQ of its non-compliance.

43.     On January 29, 2007, the Company filed its form 10-K for the  fiscal year ending June 30, 2006 with the SEC. The form 10- K included restated financials statement covering 1994-2006.  In addition, the Company admitted that the during the Special Committee's investigation they indeed discovered that stock options had been retroactively priced for all employees who received grants:

1    As a result of an investigation of our historical stock option practices by a Special
2    Committee of our Board of Directors . . . *we discovered that certain of our stock
     options, primarily those granted from July 1, 1997 to June 30, 2002, had been
3    retroactively priced for all employees who received these grants (less than 15% of
     these options were granted to executive officers). This means that the option
4    exercise price was not the market price of the option shares on the actual grant
     date of the option, but instead was a lower market price on an earlier date.*

5    *The actual grant date—when the essential actions necessary to grant the option
     were completed, including the final determination of the number of shares to be
6    granted to each employee and the exercise price—is the correct measurement date
     to determine the market price of the option shares under the accounting rules in
7    effect at the time. More than 95% of the total in-the-money value (market price on
     the actual grant date minus exercise price) of all of our retroactively priced options
8    was attributable to those granted from July 1, 1997 to June 30, 2002.*

9          44.    In addition to admitting that option grants had been backdated during the Relevant

10   Period, the Company, in its January 29, 2007 form 10- K, admitted that the Company had failed to

11   properly apply APB Opinion No. 25 which requires that a compensation expense be taken for

12   options whose exercise price is lower that the market price on the date of the grant, thus requiring

13   restatement of $348 million for the period of 1994-2005 compensation expense:

14   *Because each of our retroactively priced options had an exercise price below the
     market price on the actual grant date, there should have been a charge for each of
15   these options under APB Opinion No. 25 equal to the number of option shares,
     multiplied by the difference between the exercise price and the market price on the
16   actual grant date. That expense should have been amortized over the vesting period
     of the option. Starting in our fiscal year ended June 30, 2006, we adopted SFAS
17   No. 123(R), "Share-Based Payment." As a result, for fiscal year 2006, the
     additional stock-based compensation expense required to be recorded for each
18   retroactively priced option was equal to the incremental fair value of these options
     on the actual grant date over the remaining vesting period of the option. We did
19   not record these stock-based compensation expenses under APB Opinion No. 25 or
     SFAS No. 123(R) related to our retroactively priced options in our previously
20   issued financial statements, and that is why we are restating them in this filing.*

21   *To correct our past accounting for stock options, we recorded additional pre-tax,
     non-cash, stock-based compensation expense of (a) $348 million for the periods
22   July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $22 million for
     the year ended June 30, 2006 under SFAS No. 123(R). We expect to amortize an
23   additional $6 million of such pre-tax charges under SFAS No. 123(R) in future
     periods to properly account for past retroactively priced option grants.*

24         45.    The Company further detailed the Special Committee's findings, including its

25   findings that the retroactive price of stock options was intentional and involved the falsification of

26   Company records, and the 10-K revealed that "Management reviewed the findings of the Special

27   Committee and conducted its own internal review of our past stock option grants and other aspects

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW   - 17 -

of our historical financial statements. Management agrees with the Special Committee . . . ." The 10K detailed their findings as follows:

> **By October 16, 2006, the Special Committee had substantially completed its investigation. The Special Committee concluded that**
>
> **(1) there was retroactive pricing of stock options granted to all employees who received options, primarily during the periods from July 1, 1997 to June 30, 2002 (less than 15% of these options were granted to executive officers),**
>
> **(2) the retroactively priced options were not accounted for correctly in our previously issued financial statements,**
>
> **(3) the retroactive pricing of options was intentional, not inadvertent or through administrative error,**
>
> **(4) the retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct,**
>
> **(5) the retroactive pricing of options involved the falsification of Company records, resulting in erroneous statements being made in financial and other reports previously filed with the SEC, as well as in information previously provided to our independent registered public accounting firm, and**
>
> **(6) in most instances, the retroactive pricing of options violated the terms of our stock option plans. Because virtually all holders of retroactively priced options issued by the Company were not involved in or aware of the retroactive pricing, the Board of Directors decided that we should continue to honor the options that violated the terms of our stock option plans, except in certain individual cases as described below.**
>
> **The Special Committee concluded that, with a few immaterial exceptions, the retroactive pricing of stock options stopped after June 30, 2002. After that time, there were procedures in place designed to provide reasonable assurance that stock options were priced on the grant date. The Special Committee also concluded that none of our independent Directors was involved in or aware of the retroactive pricing of stock options. Based on the Special Committee's report, our Board of Directors concluded that no current members of management were involved in the retroactive pricing of stock options. During its investigation** of our historical stock option practices, the Special Committee did not find evidence of any other financial reporting or accounting issues.

46. With respect to certain individuals alleged herein to have either participated in the issuance of or received backdated stock options, the Company made the following disclosures with respect to Defendants Levy, Schroeder, Nichols, Kispert, Tomkins and Wallace. More specifically, the Company cancelled all outstanding stock options to held by Schroeder and repriced stock options that were issued to defendants Levy, Nichols, Tomkins, Wallace and Kispert:

1    Schroeder

2    *As a result of the Special Committee investigation, on October 16, 2006, we
     terminated our employment relationship and agreement with Kenneth L.*
3    *Schroeder, and we announced our intent to cancel all outstanding stock options
     held by Mr. Schroeder that were retroactively priced or otherwise improperly*
4    *granted. Those options [596, 740] were canceled in December 2006*. . . .

5    . . . Accordingly, in the second quarter of fiscal 2007 we will reverse approximately
     $20 million of the non-cash, stock-based compensation charge recorded in prior
6    periods. In December 2006, we canceled 596,740 vested option shares held by Mr.
     Schroeder as of the time of termination, representing those shares that had been
7    retroactively priced or otherwise improperly granted.

8    Nichols

9    Also on October 16, 2006, Stuart J. Nichols, Vice President and General Counsel,
     resigned. Mr. Nichols and we entered into a Separation Agreement and General
10   Release under which *Mr. Nichols' outstanding retroactively priced stock options
     have been re-priced by increasing the exercise price to the market price of the*
11   *option shares on the actual grant date*.

12   Levy

13   On October 16, 2006, Kenneth Levy, Founder and Chairman of the Board of
     Directors of the Company, retired as a director and employee, and was named
14   Chairman Emeritus by our Board of Directors.  *Mr. Levy and we entered into a
     Separation Agreement and General Release under which Mr. Levy's outstanding*
15   *retroactively priced stock options have been re-priced by increasing the exercise
     price to the market price of the option shares on the actual grant date*.

16   Tompkins
17
     On December 21, 2006, Jon D. Tompkins resigned as a director of the Company, and
18   we agreed to modify the outstanding options held by Mr. Tompkins (all of which
     were fully vested) to extend the post-termination exercisability period to December
19   31, 2007, which is the last day of the calendar year in which those options would
     have terminated in the absence of such extension. . . .
20
     Kispert
21
     Although the Board of Directors concluded that John H. Kispert, our President and
22   Chief Operating Officer, was not involved in and was not aware of the improper
     stock option practices, *based on the Special Committee's recommendation, his*
23   *outstanding retroactively priced options have been re-priced because he served as
     Chief Financial Officer during part of the period in question. This re-pricing*
24   *involved increasing the exercise price to the market price of the option shares on
     the actual grant date*.
25
         47.     Finally, with respect to the some of the tax implications caused by the backdated
26
     stock options and the Company's failure to properly account for them, the Company stated that it
27

28

will pay bonuses to defendant Wallace and to non officers to address adverse consequences of backdated stock options:

> Three of the Company's option holders were subject to the December 31, 2006 deadline described above. Accordingly, in December 2006, the Company offered to amend the 409A Affected Options held by Mr. Wallace, the Company's Chief Executive Officer, and two former executive officers to increase the exercise price so that these options will not subject the option holder to a penalty tax under IRC Section 409A. All three individuals accepted the Company's offer. In addition, the Company agreed to pay each of the three individuals a cash bonus in January 2008 equal to the aggregate increase in the exercise prices for his amended options. For Mr. Wallace, the amount of this bonus is $0.4 million. The Company plans to take similar actions with respect to the outstanding 409A Affected Options granted to non-officers as soon as possible after the filing of this Report. The Company estimates that the total cash payments needed to deal with the adverse tax consequences of retroactively priced options granted to non-officers will be approximately $30 million.

> With respect to the individuals whose options were canceled or re-priced by the Company following the Special Committee investigation, no bonuses of the type described above will be paid.

48.     Defendants' gross mismanagement and malfeasance over the past decade has exposed KLA-Tencor and its senior executives to criminal and civil liability for issuing false and misleading financial statements.  Specifically, Defendants caused or allowed KLA-Tencor to issue statements that failed to disclose or misstated the following: (a) that the Company had material weaknesses its internal controls that prevented it from issuing accurate financial reports and projections; (b) that because of improperly recorded stock-based compensation expenses, the Company's financial results violated GAAP; and (c) that the Company's public disclosures presented an inflated view of KLA-Tencor's earnings and earnings per share ("EPS").

49.     Defendants' malfeasance and mismanagement during the Relevant Period has wreaked millions of dollars of damages on KLA-Tencor.  The Company's senior executives were incentivized to over-pay themselves, to profit from their misconduct by cashing in on under-priced stock options and to issue false financial statements to cover up their misdeeds.  Defendants' breach of fiduciary duties in the administration of the Company's stock option plans so polluted the plans with grant date manipulations as to void all grants made pursuant to the plans. Meanwhile, certain of the Defendants, who received under-priced stock options and/or knew material non-public information regarding KLA-Tencor's internal control problems, abused their fiduciary relationship

1   with the Company by selling over $259 million worth of their personally held shares at artificially

2   inflated prices during the Relevant Period.  This action seeks recovery for KLA-Tencor against these

3   faithless fiduciaries, as KLA-Tencor's Board, as currently composed, is simply unable or unwilling

4   to do so as more fully set in the Derivative Demand Futility Allegations, *infra*, ¶¶165-169.

5       50.    At the time the first derivative action was commenced, the KLA-Tencor Board

6   consisted of nine directors: Levy, Barnholt, Wallace, Kaufman, Urbanek, Bond, Tompkins, David

7   Wang ("Wang") and Bingham.   Eight of these directors are incapable of independently and

8   disinterestedly considering a demand to commence and vigorously prosecute the derivative actions:

9       (a)    Defendants Levy, Tompkins and Wallace are incapable because they received

10  backdated stock options, and they are directly interested in the improperly backdated stock option

11  grants complained of herein, as recipients thereof.  These defendants also sold hundreds of thousands

12  of shares of KLA-Tencor stock for millions of dollars in insider trading proceeds (*see supra*, ¶27);

13      (b)    Bond, Barnholt and Urbanek are incapable because, as members of the

14  Compensation Committee, each directly participated in and approved the improper backdating of

15  stock options, as alleged herein, or misrepresented and falsely assured the Company shareholders

16  that KLA-Tencor stock options were issued at fair market value on the date of the grant.  They

17  indeed were the Board members who purported but failed to "***review[] . . . the Company's executive***

18  ***compensation policy and administer[] the Company's . . . equity benefit plan***" under which stock

19  options were granted.  Moreover, by colluding with Defendants and others, as alleged herein, Bond,

20  Barnholt and Urbanek have demonstrated that they are unable and unwilling to act independently of

21  Defendants; and

22      (c)    All of the members of the Audit Committee, including Bingham, Bond and

23  Kaufman, are incapable because as veteran members of the Audit Committee, they directly

24  participated in and approved the Company's knowing violations of GAAP and IRS Code §162(m),

25  as alleged herein.  Defendant Bingham was represented to shareholders as being a "financial expert,"

26  and has been Chairman of the Audit Committee for the last five years.  Moreover, by colluding with

27  Defendants and others, as alleged herein, Bingham, Bond and Kaufman have demonstrated that they

28  are unable and unwilling to act independently of Defendants.

**INTRADISTRICT ASSIGNMENT**

51.     A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of Santa Clara, and as such this action is properly assigned to the San Jose division of this Court.

**JURISDICTION AND VENUE**

52.     The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, and under California and Delaware law for violations of breach of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement.  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

53.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §§1331 and 1337.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

54.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

55.     Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  KLA-Tencor is located in and conducts its business in this District.  Further, Defendants conduct business in this District, and are citizens of California and reside in this District.

**PARTIES**

56.     Plaintiff Alaska Electrical Pension Fund is, and at times relevant hereto was, a shareholder of nominal party KLA-Tencor.  During the Relevant Period, the Company had more than 500 shareholders of record.

57.     Nominal party KLA-Tencor is a supplier of process control and yield management solutions for the semiconductor and related microelectronics industries.  The Company's portfolio of

products, software, analysis, services and expertise is designed to help integrated circuit manufacturers manage yield throughout the entire fabrication process, from research and development to final mass-production yield analysis.  The Company was founded in July 1975 as KLA Instruments Corporation.  In May 1997, KLA Instruments merged with Tencor Instruments – another longtime leader in semiconductor industry – and changed its name to KLA-Tencor.

58.    Defendant Levy has been Chairman of the Board of KLA-Tencor since July 1999. Levy is the founder of KLA Instruments and at all times has served as a director of the Company. Levy served as the CEO of KLA Instruments from its inception until its merger with Tencor Instruments in May 1997.  From July 1998 to June 1999, Levy served as CEO of KLA-Tencor.  At all relevant times, Levy actively participated in the management of KLA-Tencor's daily business affairs and finances.  He also actively participated in the preparation, review and approval of KLA-Tencor's publicly reported financial results and financial statements for Fiscal Years ("FY")[5] 1995-2005, as well as the corresponding reports on SEC Form 10-K and press releases.  By reason of his executive positions with the Company, Board membership and ownership of KLA-Tencor stock, Levy was a controlling person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein.  Based on his knowledge of material non-public information regarding the Company, defendant Levy violated Cal. Corp. Code §§25402 and 25502.5 by selling 2.28 million KLA-Tencor shares for insider trading proceeds of more than $111 million.

59.    Defendant Schroeder was from 1991 to 1999 President and COO of the Company. He was a CEO of the Company.  During the Relevant Period, Schroeder was also a director of KLA-Tencor from July 1, 1999, until he retired from the Company effective January 1, 2006.  Schroeder initially joined KLA Instruments in 1979 and left in 1987.  Schroeder returned to KLA Instruments in 1991.  From November 1991 to July 2002 Schroeder held the position of President of the Company.  He again held the position of President from May 2004 to July 2005.  At all relevant

[5]    KLA-Tencor's fiscal year ends June 30.  Accordingly, the Company's FY 1995 started July 1, 1994 and ended June 30, 1995.

1    times, Schroeder actively participated in the management of KLA-Tencor's daily business affairs

2    and finances.  He also actively participated in the preparation, review and approval of KLA-Tencor's

3    publicly reported financial results and financial statements for FY 1995-2005, as well as the

4    corresponding reports on SEC Form 10-K and press releases.  By reason of his executive positions

5    with the Company, Board membership and ownership of KLA-Tencor stock, Schroeder was a

6    controlling person of KLA-Tencor and had the power and influence, and exercised the same, to

7    cause KLA-Tencor to engage in the conduct detailed with particularity herein.  Based on his

8    knowledge of material non-public information regarding the Company, defendant Schroeder violated

9    Cal. Corp. Code §§25402 and 25502.5 by selling 1.25 million KLA-Tencor shares for insider trading

10   proceeds of more than $64 million.

11          60.     Defendant Wallace is the current CEO and a director of KLA-Tencor.  Defendant

12   Wallace, during the Relevant Period and since 2000, was Executive Vice President ("EVP") of the

13   Company.  He was appointed to his current position effective January 1, 2006.  Wallace joined

14   KLA-Tencor in 1988 serving in a variety of senior management positions – most recently serving as

15   President and COO from July 2005 to January 2006.  Wallace also actively participated in the

16   preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

17   statements for FY 1995-2005, as well as the corresponding reports on SEC Form 10-K and press

18   releases.  By reason of his executive positions with KLA-Tencor, Board membership and ownership

19   of KLA-Tencor stock, Wallace was a controlling person of KLA-Tencor and had the power and

20   influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with

21   particularity herein.  Based on his knowledge of material non-public information regarding the

22   Company, defendant Wallace violated Cal. Corp. Code §§25402 and 25502.5 by selling 292,499

23   KLA-Tencor shares for insider trading proceeds of more than $15.5 million during the Relevant

24   Period.

25          61.     Defendant Kispert is the current President and COO of KLA-Tencor.  He was

26   appointed to his current position effective January 1, 2006.  Previously, Kispert served as CFO of

27   KLA-Tencor from July 2000 until his promotion to President and COO.  Kispert joined KLA-Tencor

28   in 1995 serving in a variety of senior management positions.  Kispert actively participated in the

1  preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

2  statements for FY 1995-2005, as well as the corresponding reports on SEC Form 10-K and press

3  releases.  By reason of his executive positions at the Company and ownership of KLA-Tencor stock,

4  Kispert was a controlling person of KLA-Tencor and had the power and influence, and exercised the

5  same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein.  Based on his

6  knowledge of material non-public information regarding the Company, defendant Kispert violated

7  Cal. Corp. Code §§25402 and 25502.5 by selling 341,500 KLA-Tencor shares for insider trading

8  proceeds of more than $20.1 million during the Relevant Period.

9      62.    Defendant Hall is the CFO of KLA-Tencor.  He was appointed to his current position

10  effective January 1, 2006.  Hall joined the Company in 2000 acting as the Vice President ("VP") of

11  Finance, Mergers and Acquisitions.  During the Relevant Period, Hall actively participated in the

12  preparation, review and approval of KLA-Tencor's publicly reported financial results and financial

13  statements for FY 2000-2005, as well as the corresponding reports on SEC Form 10-K and press

14  releases.  By reason of his executive positions at the Company and ownership of KLA-Tencor stock,

15  Hall was a controlling person of KLA-Tencor and had the power and influence, and exercised the

16  same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein.  Based on his

17  knowledge of material non-public information regarding the Company, defendant Hall violated Cal.

18  Corp. Code §§25402 and 25502.5 by selling 12,300 KLA-Tencor shares for insider trading proceeds

19  of $607,060 during the Relevant Period.

20      63.    Defendant Boehlke was, from April 1997 to 2000, EVP and CFO.  Defendant

21  Boehlke joined KLA-Tencor in April 1983 as VP and General Manager of the RAPID Division.

22  During the next seven years he became Senior VP and then EVP in charge of several operating

23  divisions, including RAPID, WISARD and ATS.  He was COO from August 1989 until July 1990,

24  when he became CFO.  Because of Boehlke's position and history with the Company, he knew

25  adverse non-public information about the business of KLA-Tencor, as well as its finances, markets

26  and present and future business prospects, via access to internal corporate documents, conversations

27  and connections with other corporate officers and employees, attendance at management meetings,

28  and via reports and other information provided to him in connection therewith.  Boehlke actively

1     participated in the preparation, review and approval of KLA-Tencor's publicly reported financial

2     results and financial statements as well as the corresponding reports on SEC Form 10-K and press

3     releases.  During the Relevant Period, Boehlke received backdated stock options.  In addition, during

4     the Relevant Period between August 1, 1997 and March 3, 2000, Boehlke sold 352,400 shares of

5     KLA-Tencor stock for insider trading proceeds of $14,136,130.

6         64.     Defendant Tompkins has been a director of the Company since April 1997.

7     Previously, Tompkins served as CEO from May 1997 until July 1998 and as Chairman of the Board

8     from July 1998 to June 1999.  Tompkins was President, CEO and Chairman of the Board of Tencor

9     Instruments.  During the Relevant Period, Tompkins actively participated in the preparation, review

10     and approval of KLA-Tencor's publicly reported financial results and financial statements for FY

11     1997-2005, as well as the corresponding reports on SEC Form 10-K and press releases.  By reason of

12     his Board membership and ownership of KLA-Tencor stock, Tompkins was a controlling person of

13     KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to

14     engage in the conduct detailed with particularity herein.  Based on his knowledge of material non-

15     public information regarding the Company, defendant Tompkins violated Cal. Corp. Code §§25402

16     and 25502.5 by selling 670,049 KLA-Tencor shares for insider trading proceeds of $31.5 million

17     during the Relevant Period.

18         65.     Defendant Urbanek has been a director of the Company since April 1997.  From

19     August 1991 until April 1997, Urbanek was a director of Tencor Instruments prior to its merger with

20     KLA Instruments.  During the Relevant Period, Urbanek actively participated in the preparation,

21     review and approval of KLA-Tencor's publicly reported financial results and financial statements for

22     FY 1997-2005, as well as the corresponding reports on SEC Form 10-K and press releases.  By

23     reason of her Board membership and ownership of KLA-Tencor stock, Urbanek was a controlling

24     person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-

25     Tencor to engage in the conduct detailed with particularity herein.  Based on her knowledge of

26     material non-public information regarding the Company, defendant Urbanek violated Cal. Corp.

27     Code §§25402 and 25502.5 by selling 9,149 KLA-Tencor shares for insider trading proceeds of

28     $448,324 during the Relevant Period.

66.    Defendant Bingham has been a director of the Company since October 1999. During the Relevant Period, Bingham actively participated in the preparation, review and approval of KLA-Tencor's publicly reported financial results and financial statements for FY 2000-2005, as well as the corresponding reports on SEC Form 10-K and press releases.  By reason of his Board membership and ownership of KLA-Tencor stock, Bingham was a controlling person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein.  Based on his knowledge of material non-public information regarding the Company, defendant Bingham violated Cal. Corp. Code §§25402 and 25502.5 by selling 5,000 KLA-Tencor shares for insider trading proceeds of $263,100 during the Relevant Period.

67.    Defendant Bond has been a director of the Company since August 2000. During the Relevant Period, Bond actively participated in the preparation, review and approval of KLA-Tencor's publicly reported financial results and financial statements for FY 2000-2005, as well as the corresponding reports on SEC Form 10-K and press releases.  By reason of his Board membership and ownership of KLA-Tencor stock, Bond was a controlling person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein.  Based on his knowledge of material non-public information regarding the Company, defendant Bond violated Cal. Corp. Code §§25402 and 25502.5 by selling 5,000 KLA-Tencor shares for insider trading proceeds of $253,050 during the Relevant Period.

68.    Defendant Barnholt has been a director of the Company since 1995. During the Relevant Period, Barnholt actively participated in the preparation, review and approval of KLA-Tencor's publicly reported financial results and financial statements for FY 1995-2005, as well as the corresponding reports on SEC Form 10-K and press releases.  By reason of his Board membership and ownership of KLA-Tencor stock, Barnholt was a controlling person of KLA-Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein.  Based on his knowledge of material non-public information regarding the Company, defendant Barnholt violated Cal. Corp. Code §§25402 and

1    25502.5 by selling 29,000 KLA-Tencor shares for insider trading proceeds of $1.4 million during the
2    Relevant Period.

3        69.    Defendant Kaufman has been a director of the Company since November 2002.
4    During the Relevant Period, Kaufman actively participated in the preparation, review and approval
5    of KLA-Tencor's publicly reported financial results and financial statements for FY 2003-2005, as
6    well as the corresponding reports on SEC Form 10-K and press releases.  By reason of his Board
7    membership and ownership of KLA-Tencor stock, Kaufman was a controlling person of KLA-
8    Tencor and had the power and influence, and exercised the same, to cause KLA-Tencor to engage in
9    the conduct detailed with particularity herein.

10       70.    Defendant Elkus, during the Relevant Period and since April 1997, was a director of
11   the Company and during the Relevant Period sat on the Company's Audit Committee which was
12   responsible for overseeing the accounting and financial reporting processes.  Elkus actively
13   participated in the preparation, review and approval of KLA-Tencor's publicly reported financial
14   results and financial statements for FY 1999-2005, as well as the corresponding reports on SEC
15   Form 10-K and press releases.  Elkus also sat on the Company's Nominating and Governance
16   Committee in 2003.  By reason of his Board membership and ownership of KLA-Tencor stock,
17   Elkus was a controlling person of KLA-Tencor and had the power and influence, and exercised the
18   same, to cause KLA-Tencor to engage in the conduct detailed with particularity herein.  During the
19   Relevant Period, Elkus violated Cal. Corp. Code §§25402 and 25502.5 by selling 155,416 shares of
20   KLA stock for proceeds of more than $7 million.

21       71.    Defendant Nichols was, during the Relevant Period, VP and General Counsel for the
22   Company.  Because of Nichols' position with KLA-Tencor, he knew adverse non-public information
23   about the business of KLA-Tencor, as well as its finances, markets and present and future business
24   prospects, via access to internal corporate documents, conversations and connections with other
25   corporate officers and employees, attendance at management meetings, and via reports and other
26   information provided to him in connection therewith.  Defendant Nichols actively participated in the
27   preparation, review and approval of KLA-Tencor's publicly reported financial results and financial
28   statements, as well as the corresponding reports on SEC Form 10-K and press releases.

72.     Defendant Chamberlain was, during the Relevant Period, a director of the Company and had been a director since 1982. Chamberlain sat on the Company Compensation Committee from 1995-1999, and was a member of the Company's Audit Committee in 2000. During the Relevant Period, defendant Chamberlain violated Cal. Corp. Code §§25402 and 25502.5 by selling 81,764 shares for proceeds of $4,839,107. Because of defendant Chamberlain's position with KLA-Tencor, he knew adverse non-public information about the business of KLA-Tencor, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, and via reports and other information provided to him in connection therewith. Defendant Chamberlain actively participated in the preparation, review and approval of KLA-Tencor's publicly reported financial results and financial statements during the Relevant Period, as well as the corresponding reports on SEC Form 10-K and press releases.

73.     Defendant Schnitzer was, during the Relevant Period, EVP of the Company. From June 1997 to October 1998 he was EVP, Human Resources. From July 1993 to June 1997 he was Group VP responsible for RAPID, SEMSpec, Prism and manufacturing for WISARD and RAPID. From 1989 to July 1993 he was VP and General Manager of the WISARD Division. Defendant Schnitzer joined KLA-Tencor in July 1978 and held a series of other management positions. Because of Schnitzer's position with KLA-Tencor, he knew adverse non-public information about the business of KLA-Tencor, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings, and via reports and other information provided to him in connection therewith. During the Relevant Period, defendant Chamberlain violated Cal. Corp. Code §§25402 and 25502.5 by selling 471,664 shares of KLA-Tencor stock for insider trading proceeds of $26,807,656.

74.     Defendant Dickerson, during the Relevant Period and since 1999, served as COO of the Company, and President of the Company since 2002. Dickerson has held management or executive management positions at the Company since 1994, including EVP of the Customer Group and Group VP of the Wafer Inspection Division. Because of Dickerson's position with KLA-

1  Tencor, he knew adverse non-public information about the business of KLA-Tencor, as well as its

2  finances, markets and present and future business prospects, via access to internal corporate

3  documents, conversations and connections with other corporate officers and employees, attendance

4  at management meetings, and via reports and other information provided to him in connection

5  therewith.  Defendant Dickerson actively participated in the preparation, review and approval of

6  KLA-Tencor's publicly reported financial results and financial statements, as well as the

7  corresponding reports on SEC Form 10-K and press releases.  During the Relevant Period,

8  Dickerson violated Cal. Corp. Code §§25402 and 25502.5 by selling 574,000 KLA-Tencor shares

9  for more than $27 million in insider trading proceeds.

10                                          **DEFENDANTS' DUTIES**

11          75.     Each officer and director of KLA-Tencor named herein owed the Company and

12  KLA-Tencor shareholders the duty to exercise a high degree of care, loyalty and diligence in the

13  management and administration of the affairs of the Company, as well as in the use and preservation

14  of its property and assets.  The conduct of KLA-Tencor's directors and officers complained of herein

15  involves knowing, intentional and culpable violations of their obligations as officers and directors of

16  KLA-Tencor.  Further, the misconduct of KLA-Tencor's officers has been ratified by KLA-Tencor's

17  Board, which has failed to take any legal action on behalf of the Company against them.

18          76.     By reason of their positions as officers, directors and fiduciaries of KLA-Tencor and

19  because of their ability to control the business and corporate affairs of the Company, the Defendants

20  owed KLA-Tencor and its shareholders fiduciary obligations of candor, trust, loyalty and care, and

21  were required to use their ability to control and manage KLA-Tencor in a fair, just, honest and

22  equitable manner, and to act in furtherance of the best interests of KLA-Tencor and its shareholders

23  so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In

24  addition, as officers and/or directors of a publicly held company, the Defendants had a duty to

25  refrain from utilizing their control over KLA-Tencor to divert assets to themselves via improper

26  and/or unlawful practices.  Defendants also had a duty to promptly disseminate accurate and truthful

27  information with respect to the Company's operations, earnings and compensation practices.

28

1       77.    Because of their positions of control and authority as directors or officers of KLA-

2   Tencor, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts

3   complained of herein.   As to the Defendants who served as directors, these acts include: (a)

4   agreement to and/or acquiescence in Defendants' option backdating scheme; and (b) willingness to

5   cause KLA-Tencor to disseminate false Proxy Statements for FY 1995-2005, which Proxy

6   Statements failed to disclose Defendants' option backdating scheme and omitted the fact that

7   executive officers were allowed to backdate their stock option grants in order to manipulate the

8   strike price of the stock options they received.  Because of their positions with KLA-Tencor, each of

9   the Defendants was aware of these wrongful acts, had access to adverse non-public information and

10  was required to disclose these facts promptly and accurately to KLA-Tencor shareholders and the

11  financial markets but failed to do so.

12      78.    Between FY 1995 and 2005, Defendants repeated in each Proxy Statement that the

13  stock option grants made during that period carried an exercise price that was ***not less than*** the fair

14  market value of KLA-Tencor stock on the date granted, as calculated by the public trading price of

15  the stock at the market's close on that date.   However, Defendants concealed until 2006 that the

16  stock option grants were repeatedly and consciously ***backdated*** to ensure that the strike price

17  associated with the option grants was at or near the lowest trading price for that fiscal period.  Due to

18  Defendants' breach of their fiduciary duty in the administration of the stock option plans, plaintiffs

19  seek to have the directors' and officers' plans voided and gains from those plans returned to the

20  Company.   In the alternative, plaintiffs seek to have all of the unexercised options granted to

21  Defendants between 1994 and 2002 cancelled, the financial gains obtained via the exercise of such

22  options returned to the Company and to have Defendants revise the Company's financial statements

23  to reflect the truth concerning these option grants.

24      79.    To discharge their duties, the directors of KLA-Tencor were required to exercise

25  reasonable and prudent supervision over the management, policies, practices and controls of the

26  business and financial affairs of KLA-Tencor.  By virtue of such duties, the officers and directors of

27  KLA-Tencor were required, among other things, to:

28

1             (a)      Manage, conduct, supervise and direct the business affairs of KLA-Tencor in

2  accordance with all applicable law (including federal and state laws, government rules and

3  regulations and the charter and bylaws of KLA-Tencor);

4             (b)      Neither engage in self-dealing nor knowingly permit any officer, director or

5  employee of KLA-Tencor to engage in self-dealing;

6             (c)      Neither violate nor knowingly permit any officer, director or employee of

7  KLA-Tencor to violate applicable laws, rules and regulations;

8             (d)      Remain informed as to the status of KLA-Tencor's operations, including its

9  practices in relation to the cost of allowing the pervasive backdating and improperly accounting for

10  such, and upon receipt of notice or information of imprudent or unsound practices, to make a

11  reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices

12  and make such disclosures as are necessary to comply with federal securities laws and their duty of

13  candor to the Company's shareholders;

14             (e)      Prudently protect the Company's assets, including taking all necessary steps

15  to recover corporate assets (cash, stock options) improperly paid to Company executives and

16  directors together with the related costs (professional fees) proximately caused by the illegal conduct

17  described herein;

18             (f)      Establish and maintain systematic and accurate records and reports of the

19  business and affairs of KLA-Tencor and procedures for the reporting of the business and affairs to

20  the Board and to periodically investigate, or cause independent investigation to be made of, said

21  reports and records;

22             (g)      Maintain and implement an adequate, functioning system of internal legal,

23  financial and accounting controls, such that KLA-Tencor's financial statements – including its

24  expenses, accounting for stock option grants and other financial information – would be accurate and

25  the actions of its directors would be in accordance with all applicable laws;

26             (h)      Exercise control and supervision over the public statements to the securities

27  markets and trading in KLA-Tencor stock by the officers and employees of KLA-Tencor; and

28

1     (i)     Supervise the preparation and filing of any financial reports or other

2   information required by law from KLA-Tencor and to examine and evaluate any reports of

3   examinations, audits or other financial information concerning the financial affairs of KLA-Tencor

4   and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the

5   subjects and duties set forth above.

6     80.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to

7   the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of

8   due care and diligence in the management and administration of the affairs of the Company, as well

9   as in the use and preservation of its property and assets.  The conduct of the Defendants complained

10  of herein involves a knowing and culpable violation of their obligations as directors and/or officers

11  of KLA-Tencor, the absence of good faith on their part, and a reckless disregard for their duties to

12  the Company and its shareholders, which Defendants were aware or should have been aware posed a

13  risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or

14  directors of the Company during the Relevant Period has been ratified by the Defendants who served

15  as directors who comprised KLA-Tencor's entire Board during the Relevant Period.

16    81.     Defendants breached their duties of loyalty and good faith by allowing or by

17  themselves causing the Company to misrepresent its financial results and prospects, as detailed

18  herein *infra*, and by failing to prevent the Defendants from taking such illegal actions.  In addition,

19  as a result of Defendants' illegal actions and course of conduct during the Relevant Period, the

20  Company is now the subject of an SEC investigation.  As a result, KLA-Tencor has expended and

21  will continue to expend significant sums of money.  Such expenditures include, but are not limited

22  to:

23    (a)     Improvidently paid executive compensation;

24    (b)     Increased capital costs as a result of the loss of market capitalization and the

25  Company's damaged reputation in the investment community;

26    (c)     Professional costs associated with the SEC's inquiry and the U.S. Attorney's

27  investigation;

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 33 -

1    (d)  Costs incurred to carry out internal investigations, including legal fees paid to

2 outside counsel; and

3    (e)  Incurring possible IRS penalties for improperly reporting compensation.

4    82.  These actions have irreparably damaged KLA-Tencor's corporate image and

5 goodwill.  For at least the foreseeable future, KLA-Tencor will suffer from what is known as the

6 "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

7 behavior and have misled the investing public, such that KLA-Tencor's ability to raise equity capital

8 or debt on favorable terms in the future is now impaired.

9        **AIDING AND ABETTING AND CONCERTED ACTION**

10    83.  In committing the wrongful acts alleged herein, Defendants have pursued or joined in

11 the pursuit of a common course of conduct, and have acted in concert with one another in

12 furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as

13 giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in

14 breach of their respective duties.

15    84.  At relevant times, Defendants collectively and individually initiated a course of

16 conduct which was designed to and did: (a) conceal the fact that the Company was over-paying its

17 directors, officers and employees and improperly misrepresenting its financial results, in order to

18 allow Defendants to artificially inflate the price of the Company's shares; (b) maintain Defendants'

19 executive and directorial positions at KLA-Tencor and the profits, power and prestige which

20 Defendants enjoyed as a result of these positions; (c) deceive the investing public, including

21 shareholders of KLA-Tencor, regarding Defendants' management of KLA-Tencor's operations, the

22 Company's financial health and stability, and future business prospects, which had been

23 misrepresented by Defendants throughout the Relevant Period; and (d) allow several of the

24 Company's officers and directors to sell millions of dollars worth of Company stock at inflated

25 prices.  In furtherance of this course of conduct, Defendants collectively and individually took the

26 actions set forth herein.

27    85.  Defendants engaged in a common course of conduct commencing by at least 1995

28 and continuing thereafter.  During this time, Defendants caused the Company to conceal the true fact

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW  - 34 -

1  that KLA-Tencor was over-compensating its directors, officers and employees and misrepresenting

2  its financial results.  In addition, Defendants also made other specific, false statements about KLA-

3  Tencor's financial performance and future business prospects, as alleged herein.

4        86.    The purpose and effect of Defendants' common enterprise and/or common course of

5  conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary

6  duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to

7  conceal adverse information concerning the Company's operations, financial condition, and future

8  business prospects; and to artificially inflate the price of KLA-Tencor common stock so they could:

9  (a) dispose of millions of dollars of their own stock, and (b) protect and enhance their executive and

10  directorial positions and the substantial compensation and prestige they obtained as a result thereof.

11        87.    Defendants accomplished their common enterprise and/or common course of conduct

12  by causing the Company to purposefully, recklessly or negligently grant under-priced stock options

13  and to misrepresent its financial results.  Because the actions described herein occurred under the

14  authority of the Board, each of the Defendants was a direct, necessary, and substantial participant in

15  the common enterprise and/or common course of conduct complained of herein.

16        88.    Each of the Defendants aided and abetted and rendered substantial  assistance in the

17  wrongs complained of herein.  In taking such actions to substantially assist the commission of the

18  wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary

19  wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or

20  her overall contribution to and furtherance of the wrongdoing.

21  **FACTUAL ALLEGATIONS**

22        89.    KLA-Tencor is a supplier of process control and yield management solutions for the

23  semiconductor and related microelectronics industries.  The Company's portfolio of products,

24  software, analysis, services and expertise is designed to help integrated circuit manufacturers

25  manage yield throughout the entire fabrication process, from research and development to final

26  mass-production yield analysis.  The Company provides inline wafer defect monitoring; reticule and

27  photomask defect inspection; critical dimension metrology; wafer overlay; film and surface

28  measurement; and overall yield and fab-wide data analysis.

90.     By law, Defendants owed KLA-Tencor a duty to ensure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company.  To adequately carry out these duties, it is necessary for Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements.  This material non-public information included the problems KLA-Tencor faced because of its deficient internal controls.  Furthermore, Defendants Bingham, Bond, Elkus and Kaufman, as members of the Audit Committee of KLA-Tencor's Board, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing, in conjunction with management, the Company's policies generally with respect to the Company's earnings press releases and with respect to financial information and earnings guidance provided to Defendants as KLA-Tencor's directors and officers.  In addition, Defendants Barnholt, Urbanek, and Bond, as members of the Compensation Committee had a special duty to know and execute its oversight and execution of the Company's stock option issuance policies.

91.     Moreover, Defendants had ample opportunity to discuss this material information with management and fellow directors at any of the scores of Board meetings that occurred during the Relevant Period as well as at committee meetings of the Board.  Despite these duties, Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or conscious inactions, the misleading statements to be disseminated by KLA-Tencor to the Company's shareholders.

92.     Specifically, the reported dates KLA-Tencor stock options were granted differed from the dates on which the options were actually granted.  The practice applied to stock option grants made between 1995 and 2002, which allowed directors, officers and employees to make more money on their options because it set a lower "strike price" at which the options could be exercised, allowing employees to pocket larger profits.

93.     By manipulating the grant dates, KLA-Tencor was able to provide executives and employees with the lowest possible exercise price.  The lower the exercise price, the worse off KLA-Tencor was because it would receive less cash for the option purchased.  However, such

manipulation would allow the director, officer or other employee to increase the amount he or she would pocket by a commensurate amount.  So, as insiders, Defendants were motivated to "cherry pick" the dates on which the prices would be set.  Certain of KLA-Tencor's grants are described below (adjusted for stock splits).

### 1995 False Proxy Statement

94.     On October 17, 1995, the Company filed it Form 14-A Proxy Statement with the SEC.  In the Proxy Statement the Company described its Stock Option Plan and administration of the plan by the Board or a committee of the Board, and that generally, stock options are issued at the market price on the date of the grant:

> Grants of stock options to executive officers are based upon each officer's relative position, responsibilities, historical and expected contributions to the Company, and the officer's existing stock ownership and previous option grants, with primary weight given to the executive officer's relative rank and responsibilities.  Initial stock option grants designed to recruit an executive officer to join the Company may be based on negotiations with the officer and with reference to historical option grants to existing officers.  ***Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price***.

### 1996 False Proxy Statement

95.     On October 11, 1996, the Company filed its Form 14-A Proxy Statement with the SEC.  The Proxy Statement made the following false and misleading statements regarding the administration of the Stock Option Plan while at the same time soliciting shareholder votes for amendments thereto:

> Terms and Conditions of Options.  Each option granted under the Option Plan is evidenced by a written agreement between the Company and the optionee specifying the number of shares subject to the option and the other terms and conditions of the option, consistent with the requirements of the plan.  ***The exercise price of each option granted under the Option Plan must equal at least the fair market value of a share of the Company's Common Stock on the date of grant***.

### 1997 False Proxy Statement

96.     On October 6, 1997, the Company filed its Form 14-A Proxy Statement with the SEC and distributed the same to the Company shareholders.  The Proxy Statement made the following false and misleading statements regarding the administration of the Company's Stock Option Plans and grants to executive officers:

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 37 -

Grants of stock options to executive officers are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's previous option grants, with primary weight given to the executive officer's relative rank and responsibilities. ***Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price***.

**September 28, 1998 Proxy and 1998 Option Grants**

97.    On September 28, 1998, the Company filed a Form 14-A Proxy Statement with the SEC.  The Proxy Statement made the following false and misleading statements regarding the Company Stock Option Plans:

COMPENSATION OF DIRECTORS

. . . . The Company's Outside Directors Stock Option Plan (the "Director Plan") as adopted by the Board of Directors and approved by the stockholders, provides for the grant of an option to purchase 2,500 shares of Common Stock of the Company to each of the Company's non-employee directors on the date on which such person is elected a director. . . . ***The Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option***. . . .

    . . . ***The 1998 Director Plan provides that the exercise price shall be equal to the fair market value of the Common Stock on the date of grant of the option***. ***Options granted under the 1998 Director Plan shall become exercisable immediately upon the date of grant***.

*             *             *

***Grants of stock options to executive officers*** are based upon each executive officer's relative position, responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants, with primary weight given to the executive officer's relative rank and responsibilities. ***Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price***.

98.    Defendants dated many of KLA-Tencor's 1998 option grants as of August 31, 1998, at $10.625 per share – ***not only the low for the month but also for the year***.  The stock traded between $10.625 and $16.1563 per share during August 1998.  The stock traded between $10.625 and $24.00 per share during 1998.  Defendants Levy and Schroeder each received 204,272 options at $10.625 per share.  Also, on August 31, 1998, defendant Tompkins received 50,809 options, defendant Boehlke received 54,436 options, defendant Schnitzer received 54,436 options and defendant Dickerson received 62,882 options.

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW      - 38 -

1

2



KLA-Tencor
July 31, 1998 - September 30, 1998

**October 15, 1999 Proxy and 1999 Option Grants**

99.     On October 15, 1999, the Company filed its Form 14-A Proxy Statement. The Proxy Statement reiterated the material terms of stock option grants, including the statement that the "exercise price of the options is the fair market value of the common stock on the date of grant." Grants of stock options to executive officers are based upon each executive officer's responsibilities, historical and expected contributions to the Company, and the executive officer's existing stock ownership and previous option grants, with primary weight given to the executive officer's relative rank and responsibilities.

> Stock options are granted at market price on the date of grant and provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price.

100.    Defendants dated KLA-Tencor's 1999 option grants as of October 27, 1999, at $33.75 per share – nearly the lowest price at which the stock traded that month, when the stock traded between $33.125 and $39.5938 per share. Defendants Levy and Schroeder received 90,000 and 150,000 options, respectively, at this price. In addition, on October 27, 1999, defendants Tompkins

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 39 -

1  received 10,000 options, Boehlke received 60,000 options, Dickerson received 100,000 options and

2  Schnitzer received 50,000 options.



**October 6, 2000 Proxy Statement and 2000 Option Grants**

101.    The October 6, 2000 Proxy Statement made the following false and misleading statements regarding the administration and issuance of stock option grants to executive officers:

> Grants of stock options to executive officers are based upon each executive officer's relative position, . . . ***Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price***.

102.    Defendants dated KLA-Tencor's 2000 option grants on several dates, including one which was the lowest price for the year.  Defendants Levy and Schroeder received 37,901 and 75,800 options, respectively, at $44.69 per share on August 11, 2000, nearly the lowest price at which the stock traded that month, when the stock traded between $42.375 and $65.625 per share. Defendants Levy and Schroeder received 18,951 and 37,900 options, respectively, at $26.25 per share on November 10, 2000; defendant Tompkins (10,000) and defendant Dickerson (32,500) also received grants on November 10, 2000 – ***not only the low for the month but also the low for the year***.  The stock traded as high as $33.50 during the month and as high as $97.4375 during the year:

1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22
23



**September 28, 2001 Proxy Statement and 2001 Option Grants**

24

103.   On September 28, 2001, the Company filed its Form 14-A Proxy Statement with the

25

SEC.  The Proxy Statement made the following false and misleading statement regarding the

26

issuance of stock options to executive officers:

27

Grants of stock options to executive officers are based upon each executive officers'
relative position, responsibilities, historical and expected contributions to the

28

Company, and the executive officer's existing stock ownership and previous option grants, with primary weight given to the executive officer's relative rank and responsibilities. ***Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price***.

104. On the same September 28, 2001 Proxy Statement, the Company's Audit Committee issued a report providing substantial assurances that it had comprehensively reviewed and discussed the Company's financial statements and internal controls prior to approving the financial statements.

During each of its five meetings during fiscal year 2001, the Audit Committee met with the senior members of the Company's financial management team, the independent auditors and the Company's General Counsel when appropriate. The Audit Committee's chairman was responsible for preparing an agenda for each meeting. ***During the Committee's private sessions, the Audit Committee met with the Company's independent auditors and separately with the Company's Chief Financial Officer. The parties candidly discussed financial management, accounting and internal controls***.

105. Further, Defendants dated KLA-Tencor's 2001 option grants on several dates, including two which were at the lowest price of the month in which the options were granted. Defendants Levy, Schroeder and Dickerson received 18,951, 37,900 and 32,500 options, respectively, at $32.75 per share on April 4, 2001 – ***the low of the month***. The stock traded as high as $54.96 per share in April 2001. Defendants Levy, Schroeder, Kispert and Dickerson received 28,425, 341,100, 60,000 and 105,000 options, respectively, at $29.31 per share dated October 2, 2001 – ***again the low for the month***. The stock traded as high as $45.25 per share in October 2001:



106.    On September 25, 2002, the Company filed its Form 14-A Proxy Statement with the SEC.  The Proxy Statement made the following false and misleading statements regarding issuance of stock options to executive officers:

1
2

Grants of stock options to executive officers . . .  ***Stock options are granted at market price on the date of grant and will provide value to the executive officers only when the price of the Company's Common Stock increases over the exercise price***.

3
4
5
6
7

107.    Defendants dated KLA-Tencor's 2002 option grants as of November 8, 2002, at $37.05 per share – nearly the lowest price at which the stock traded that month, when the stock traded between $34.97 and $45.80 per share.  Defendants Schroeder, Kispert and Wallace received 31,450, 12,500 and 12,500 options, respectively, at this price:

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24
25

**THE STOCK OPTION BACKDATING SCHEME AND ITS IMPACT ON KLA-TENCOR'S FINANCIAL STATEMENTS**

26
27
28

108.    Since FY 1995, Defendants caused KLA-Tencor to report false and misleading financial results which materially understated its compensation expenses and thus overstated its earnings as follows:

| Fiscal Year | Reported Earnings (in millions) | Reported Diluted EPS |
|---|---|---|
| 1995 | $105 | $1.34 |
| 1996 | $197 | $1.17 |
| 1997 | $105 | $0.62 |
| 1998 | $134 | $0.76 |
| 1999 | $39 | $0.22 |
| 2000 | $253 | $1.32 |
| 2001 | $67 | $0.34 |
| 2002 | $216 | $1.10 |
| 2003 | $137 | $0.70 |
| 2004 | $244 | $1.21 |
| 2005 | $467 | $2.32 |
| 1Q-3Q 2006 | $251 | $1.23 |

109.   In effect, between 1995 and 2006, Defendants caused KLA-Tencor shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial results.  These financial results misrepresented and omitted to disclose that the Company had problems with its internal controls that prevented it from issuing accurate financial reports and that because of improperly recorded stock-based compensation expenses the Company's publicly reported financial statements and results presented an inflated view of KLA-Tencor's earnings and EPS.

### The FY 1995 Form 10-K

110.   On September 27, 1995, the Company filed its FY 1995 Form 10-K with the SEC signed by William Turner ("Turner"), Levy, Schroeder, Boehlke, Barnholt, Chamberlain, Samuel Rubinovitz ("Rubinovitz") and Yoshio Nishi ("Nishi").   The FY 1995 Form 10-K was simultaneously distributed to shareholders and the public. The FY 1995 Form 10-K included KLA-Tencor's FY 1995 financial statement which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

111.   The September 27, 1995 Form 10-K falsely stated that the Company issued stock options in compliance with the Company's 1982 Stock Option Plan and that options issued under said plan were issued by the Board Of Directors at "not less than fair market value on the date of the grant" as follows:

Under the 1982 Stock Option Plan, as amended, 6,350,000 shares have been reserved for issuance to eligible employees and directors as either Incentive Stock Options

1  (ISO's) or nonqualified options.  ***Options under this plan are granted at prices***
2  ***determined by the Board of Directors, but not less than the fair market value on***
   ***the date of grant*** . . . .

3  ### The FY 1996 Form 10-K

4  112.    On September 27, 1996, the Company filed its FY 1996 Form 10-K with the SEC

5  signed by Turner, Levy, Schroeder, Boehlke, Barnholt, Chamberlain, Robert Lorenzini, Nishi,

6  Rubinovitz and Dag Tellefsen ("Tellefsen").   The FY 1996 Form 10-K was simultaneously

7  distributed to shareholders and the public.  The FY 1996 Form 10-K included KLA-Tencor's FY

8  1996 financial statements which were materially false and misleading and presented in violation of

9  GAAP, due to improper accounting for the backdated stock options.  As a result, KLA-Tencor's

10  compensation expense was understated and its net earnings were overstated.

11  113.    The September 27, 1996 Form 10-K made the following false and misleading

12  statement regarding the issuance of stock options under the Company's 1982 Stock Option Plan and

13  specifically and falsely stated that options were issued at not less than fair market value on the date

14  of the grant:

15  Under the 1982 Stock Option Plan, as amended, 14,900,000 shares have been
   reserved for issuance to eligible employees and directors as either Incentive Stock
16  Options (ISO's) or nonqualified options.  ***Options under this plan are granted at***
   ***prices determined by the Board of Directors, but not less than the fair market value***
17  ***on the date of grant, and expire ten years after the date of grant***.

18  ### The FY 1997 Form 10-K

19  114.    On September 29, 1997, the Company filed its FY 1997 Form 10-K with the SEC

20  signed by Levy, Tompkins, Schroeder, Boehlke, James Bagley ("Bagley"), Barnholt, Chamberlain,

21  Elkus, Dean Morton ("Morton"), Nishi, Rubinovitz, Urbanek and Tellefsen.  The FY 1997 Form 10-

22  K was simultaneously distributed to shareholders and the public.  The FY 1997 Form 10-K included

23  KLA-Tencor's FY 1997 financial statements which were materially false and misleading and

24  presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a

25  result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

26  115.    The September 29, 1997 Form 10-K made the following false and misleading

27  statement regarding the Company's issuance of employee stock options in compliance with the

28  applicable Stock Option Plan stating that stock options were granted at fair market value on the grant

date, and that the Company properly accounted for stock options under APB Opinion No. 25 as follows:

Stock-Based Compensation Plans

***The Company accounts for its stock option plans and employee stock purchase plan in accordance with provisions of the Accounting Principles Board's Opinion No. 25 (APB OPINION NO. 25), "Accounting for Stock Issued to Employees." The Company's policy is to grant options at the fair market value on the date of grant.  Accordingly no compensation expense has been recorded.***

**The FY 1998 Form 10-K**

116.     On September 29, 1998, the Company filed its FY 1998 Form 10-K with the SEC. The FY 1998 Form 10-K was simultaneously distributed to shareholders and the public.  The September 29, 1998 Form 10-K was signed by Levy, Tompkins, Schroeder, Boehlke, Bagley, Barnholt, Chamberlain, Elkus, Morton, Nishi, Rubinovitz and Urbanek.  The FY 1998 Form 10-K included KLA-Tencor's FY 1998 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.  The Form 10-K also falsely stated that the Company properly accounted for stock options under APB Opinion No. 25:

STOCK-BASED COMPENSATION PLANS

***The Company accounts for its employee stock option plans and employee stock purchase plan in accordance with provisions of the Accounting Principles Board's Opinion No. 25 (APB OPINION NO. 25)***, "Accounting for Stock Issued to Employees."

**The FY 1999 Form 10-K**

117.     On September 28, 1999, the Company filed its FY 1999 Form 10-K with the SEC. The FY 1999 Form 10-K was simultaneously distributed to shareholders and the public signed by Levy, Schroeder, Boehlke, Bagley, Barnholt, Chamberlain, Elkus, Morton, Rubinovitz and Tompkins.  The FY 1999 Form 10-K included KLA-Tencor's FY 1999 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

118.   The Form 10-K also made the specific false and misleading statement that the Company properly accounted for stock options in accordance with APB Opinion No. 25:

STOCK-BASED COMPENSATION PLANS

**The Company accounts for its employee stock option plans and employee stock purchase plan in accordance with provisions of the Accounting Principles Board's Opinion No. 25**, "Accounting for Stock Issued to Employees."   The Company provides additional proforma disclosure required by Financial Accounting Standard (SFAS) No. 123, "Accounting for Stock-Based Compensation" (*see* Note 6).

**The FY 2000 Form 10-K**

119.   On September 28, 2000, the Company filed its FY 2000 Form 10-K with the SEC signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Morton, Tompkins and Urbanek.  The FY 2000 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2000 Form 10-K included KLA-Tencor's FY 2000 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

120.   The 2000 Form 10-K falsely represented that the Company issued stock options at prices not less than fair market value of the Company's common stock on the grant date:

STOCK OPTION AND INCENTIVE PLANS

The Company has authorized various stock option and management incentive plans for selected employees, officers, directors, and consultants. . . .

**Under the Company's stock option plans, options generally have vesting periods of four years, are exercisable for a period not to exceed ten years from the date of issuance and are granted at prices not less than the fair market value of the Company's common stock at the grant date**.

**The FY 2001 Form 10-K**

121.   On September 21, 2001, the Company filed its FY 2001 Form 10-K with the SEC signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Morton, Tompkins and Urbanek.  The FY 2001 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2001 Form 10-K included KLA-Tencor's FY 2001 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting

1   for the backdated stock options.  As a result, KLA-Tencor's compensation expense was understated

2   and its net earnings were overstated.

3       122.    The September 21, 2001 Form 10-K falsely represented that stock options issued

4   under the Company Incentive Stock Option Plan were issued at the fair market value of the stock on

5   the date of the grant:

6           Under KLA-Tencor's stock option plans, options generally have vesting periods of
   four or five years, are exercisable for a period not to exceed ten years from ***the date***
7   ***of issuance and are granted at prices not less than the fair market value of KLA-***
   ***Tencor's common stock at the grant date***.

8   **The FY 2002 Form 10-K**

9       123.    On September 20, 2002, the Company filed its FY 2002 Form 10-K with the SEC

10  signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Tompkins and Urbanek.  The

11  FY 2002 Form 10-K was simultaneously distributed to shareholders and the public.  The 2002 Form

12  10-K also included the false Sarbanes-Oxley certifications of Kispert and Schroeder.  The FY 2002

13  Form 10-K included KLA-Tencor's FY 2002 financial statements which were materially false and

14  misleading and presented in violation of GAAP, due to its improper accounting for the backdated

15  stock options.   As a result, KLA-Tencor's compensation expense was understated and its net

16  earnings were overstated.

17      124.    The September 20, 2002 Form 10-K falsely represented that option grants under its

18  Incentive Stock Option Plan were issued at no less than fair market value on the date of the grant:

19          Stock Option and Incentive Plans KLA-Tencor's stock option program is a broad-
   based, long-term retention program that is intended to attract and retain qualified
20  management and technical employees ("knowledge employees"), and align
   stockholder and employee interests. . . . ***Under KLA-Tencor's stock option plans,***
21  ***options generally have vesting periods of four or five years, are exercisable for a***
   ***period not to exceed ten years from the date of issuance and are granted at prices***
22  ***not less than the fair market value of KLA-Tencor's common stock at the grant***
   ***date***.

23

24      125.    The same Form 10-K reported that in 2002 the Company granted an additional

25  227,000 options to defendant Schroeder to incentivize him as a future leader of the Company:

26          Options granted to the top five officers as a percentage of the total options granted to
   all employees vary from year to year.  In 2002, they were a higher percentage of the
27  total grants than in the other years shown as they included Board of Director
   approved additional grants to ***Mr. Schroeder in recognition of his future potential to***

28

*lead the corporation*. ***The additional grants to Mr. Schroeder total 227,400 options with vesting on said grants* . . . .**

**The FY 2003 Form 10-K Amended September 29, 2003**

126.     On or about September 16, 2003 (amended September 29, 2003), the Company filed its FY 2003 Form 10-K with the SEC. The Form 10-K was signed by Kispert and included false Sarbanes-Oxley certifications of Schroeder and Kispert. The FY 2003 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2003 Form 10-K included KLA-Tencor's FY 2003 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As a result, KLA-Tencor's compensation expense was understated and its net earnings were overstated. The Form 10-K also falsely represented that it properly accounted for stock options under APB Opinion No. 25 and that all stock options granted under the Plan were equal in value to the common stock on the grant date:

> **Accounting for Stock-Based Compensation Plans** ***KLA-Tencor accounts for its employee stock option and employee stock purchase plans under the recognition and measurement principles of APB Opinion No. 25, Accounting for Stock Issued to Employees, and related Interpretations*. *No stock-based employee compensation is reflected in net income, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant*. . . . *Since KLA-Tencor continues to account for stock-based compensation according to APB OPINION NO. 25, its adoption of SFAS No. 148 required the Company to provide prominent disclosures about the effects of SFAS 123 on reported income and required the Company to disclose these affects in the financial statements as well*.**

127.     The September 16, 2003 Form 10-K also falsely represented that the Company's stock options were issued at prices "not less than the fair market value . . . on the date of the grant."

> Stock Option and Incentive Plans KLA-Tencor's stock option program is a broad-based, long-term retention program that is intended to attract and retain qualified management and technical employees ("knowledge employees"), and align stockholder and employee interests. ***Under KLA-Tencor's stock option plans, options generally have a vesting period of five years, are exercisable for a period not to exceed ten years from the date of issuance and are granted at prices not less than the fair market value of KLA-Tencor's common stock at the grant date*.**

**The FY 2004 Form 10-K**

128.     On August 30, 2004, the Company filed its FY 2004 Form 10-K with the SEC signed by Levy, Schroeder, Kispert, Barnholt, Bingham, Bond, Elkus, Kaufman, Michael Marks, Tompkins

and Urbanek.  The Form 10-K also attached the Sarbanes-Oxley certifications of Schroeder and Kispert.  The FY 2004 Form 10-K was simultaneously distributed to shareholders and the public. The FY 2004 Form 10-K included KLA-Tencor's FY 2004 financial statements which were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As a result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

129.    Further, the August 30, 2004 Form 10-K made the following false representations regarding the way in which options were granted and accounted for:

**Accounting for Stock-Based Compensation Plans** *KLA-Tencor accounts for its employee stock option and employee stock purchase plans under the recognition and measurement principles of APB Opinion No. 25*, Accounting for Stock Issued to Employees, and related Interpretations.  *No stock-based employee compensation is reflected in net income, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant*.

*              *              *

**Stock Option and Incentive Plans** KLA-Tencor's stock option program is a broad-based, long-term retention program that is intended to attract and retain qualified management and technical employees ("knowledge employees"), and align stockholder and employee interests. Under KLA-Tencor's stock option plans, options generally have a vesting period of five years, are exercisable for a period not to exceed ten years from the date of *issuance and are granted at prices not less than the fair market value of KLA-Tencor's common stock at the grant date*. . . .

*              *              *

*All stock option grants to officers are approved by the Compensation Committee of the Board of Directors.  All members of the Compensation Committee are independent directors, as defined in the applicable rules for issuers traded on the NASDAQ Stock Market*.

### The FY 2005 Form 10-K

130.    On September 2, 2005, the Company filed its FY 2005 Form 10-K with the SEC. The FY 2005 Form 10-K was simultaneously distributed to shareholders and the public.  The FY 2005 Form 10-K included KLA-Tencor's FY 2005 financial statements which were materially false and misleading and presented in violation of GAAP, due to its improper accounting for the backdated stock options.  As a result, KLA-Tencor's compensation expense was understated and its net earnings were overstated.

131.   The September 2, 2005 Form 10-K also attached false Sarbanes-Oxley certifications of defendants Schroeder and Kispert, falsely assuring shareholders, and made the following representations:

> Our equity incentive program is a broad-based, long-term retention program that is intended to attract and retain qualified management and technical employees ("Knowledge Employees"), and align stockholder and employee interests.   The equity incentive program consists of two plans: one under which non-employee directors may be granted options to purchase shares of our stock, and another in which non-employee directors, officers, key employees, consultants and all other employees may be granted options to purchase shares of our stock, restricted stock units and other types of equity awards.  **Under our equity incentive program, stock options generally have a vesting period of five years, are exercisable for a period not to exceed ten years from the date of issuance and are generally granted at prices not less than the fair market value of our common stock at the grant date**. . . .
>
> On October 18, 2004, the Company's stockholders approved the 2004 Equity Incentive Plan (the "Omnibus Plan") which provides for the grant of options to purchase shares of the Company's Common Stock, stock appreciation rights, restricted stock, performance shares, performance units and deferred stock units to our employees, consultants and members of our Board of Directors.  This new Plan replaces future grants under the 1982 Stock Option Plan and 2000 Nonstatutory Stock Option Plan and supplements the 1998 Outside Director Option Plan.  The shareholder approval included the creation of a reserve establishment of 11,000,000 shares of common stock for use under the plan and the ability to transfer up to an additional 1,500,000 shares of forfeited or expired stock under the 1982 Stock Option Plan and the 2000 Nonstatutory Plan.
>
> During the fiscal year ended June 30, 2005, the following actions were taken with regard to the New Equity Incentive Plan: a) a reserve of 11,000,000 shares was established, b) 1,465,853 shares were added to the reserve from the 1982 Stock Option Plan and the 2000 Nonstatutory Plan due to forfeitures or expiration, c) the 1982 Stock Option Plan was terminated; as a result, 12,358,625 shares expired, d) the 2000 Nonstatutory Plan was terminated; and, as a result, 3,447,748 shares expired, e) the 1993 Stock Option Plan was terminated, as a result, 3,500 shares expired and f) The Metrology Stock Option Plan was terminated, as a result 4,238 shares expired.

132.   The materially false and misleading FY 1995-2005 Form 10-Ks described above were reviewed, prepared and/or endorsed by the Defendants.  The following chart illustrates the Form 10-Ks signed by the Defendants:[6]

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Boehlke* | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | |
| Chamberlain | ✓ | ✓ | ✓ | ✓ | ✓ | | | | | | |

---

[6]      Unless otherwise noted, these Defendants served as directors of the Company.

| | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tompkins | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Elkus | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Urbanek | ■ | ■ | ✓ | ✓ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kispert* | ■ | ■ | ■ | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Bingham | ■ | ■ | ■ | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Bond | ■ | ■ | ■ | ■ | ■ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kaufman | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ✓ | ✓ | ✓ |
| Barnholt | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Schroeder** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Levy** | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

** = Directors and Officers
* = Officers

The Form 10-Ks also incorporated by reference Form S-8 of December 4, 1998, the 1998 Outside Director Option Plan, Restated 1982 Stock Option Plan (filed March 1997), and the March 11, 1997 Form S-4.

**KLA-TENCOR'S FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP**

133.     As a result of Defendants' improper backdating of stock options, Defendants caused KLA-Tencor to violate GAAP, SEC regulations and IRS rules and regulations.

134.     KLA-Tencor financial results for 1996-2006 were included in reports filed with the SEC and in other shareholder reports.  In these reports, Defendants represented that KLA-Tencor financial results were presented in a fair manner and in accordance with GAAP.

135.     Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

136.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17

C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

### Violations of GAAP

137.    During the Relevant Period, Defendants caused the Company to understate its compensation expense by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

138.    Under well-settled accounting principles in effect throughout the Relevant Period, KLA-Tencor did not need to record an expense for options granted to employees at the then-current market price ("at the money").  The Company was, however, required to record an expense in its financial statements for any options granted below the then-current market price ("in the money").  In order to provide KLA-Tencor executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), Defendants systematically falsified Company records to create the false appearance that options had been granted at the market price on an earlier date.

139.    Throughout the Relevant Period, KLA-Tencor accounted for stock options using the intrinsic method described in APB Opinion No. 25, Accounting for Stock Issued to Employees.  Under APB Opinion No. 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date."  An option that is "in the money" on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option.  Options that are "at the money" or "out of the money" on the measurement date need not be expensed.  Excluding non-employee directors, APB Opinion No. 25 required employers to record compensation expenses on options granted to non-employees irrespective of whether they were "in the money" or not on the date of grant.

**KLA-Tencor's Forthcoming Restatement Is an Admission of Falsity**

140.     As detailed above, the fact that KLA-Tencor will need to revise and restate downward its net income is an admission that the financial statements originally issued were false when they were reported and that the misstatements were material.

141.     Pursuant to GAAP, as set forth in APB Opinion No. 20, the type of restatements and revisions announced by KLA-Tencor were to correct for material errors in previously issued financial statements.  APB Opinion No. 20, ¶¶7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when the restatement occurs.  *Id.*, ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements.  KLA-Tencor's restatements and revisions were not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements.  Thus, the restatements and revisions were an admission by KLA-Tencor that its previously issued financial results and its public statements regarding those results were false and misleading.

**KLA-Tencor's GAAP Violations Were Material**

142.     KLA-Tencor's false and misleading Relevant Period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

143.     SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

\*       \*       \*

• whether the misstatement masks a change in earnings or other trends

• whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

\*       \*       \*

• whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

144.   SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

145.   KLA-Tencor's misstatements, by its own admissions, satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

**KLA-Tencor's Financial Statements Violated Fundamental Concepts of GAAP**

146.   Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB Opinion No. 28, 10);

(b)   The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, 34);

(c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, 40);

(d)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use

1    of enterprise resources entrusted to it.  To the extent that management offers securities of the

2    enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective

3    investors and to the public in general (FASB Statement of Concepts No. 1, 50);

4               (e)     The principle that financial reporting should be reliable in that it represents

5    what it purports to represent (FASB Statement of Concepts No. 2, 58-59);

6               (f)     The principle of completeness, which means that nothing material is left out of

7    the information that may be necessary to insure that it validly represents underlying events and

8    conditions (FASB Statement of Concepts No. 2, 79); and

9               (g)     The principle that conservatism be used as a prudent reaction to uncertainty to

10   try to ensure that uncertainties and risks inherent in business situations are adequately considered

11   (FASB Statement of Concepts No. 2, 95, 97).

12        147.     Further, the undisclosed adverse information concealed by Defendants during the

13   Relevant Period is the type of information which, because of SEC regulations, regulations of the

14   national stock exchanges and customary business practice, is expected by investors and securities

15   analysts to be disclosed, and is known by corporate officials and their legal and financial advisors to

16   be the type of information which is expected to be and must be disclosed.

17                          **Violations of the SEC Regulations**

18        148.     During the Relevant Period, Defendants caused KLA-Tencor to violate SEC

19   regulations by failing to disclose that the Company's senior executives had been granted backdated

20   stock options.

21        149.     Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer

22   must furnish information required by Item 402 of Regulation S-K (17 C.F.R. §229.402).  Item

23   402(b) and (c) require a company to provide both a summary compensation table and an option/SAR

24   ("stock appreciation right") grants table identifying the compensation of the named executive

25   officers – the Company's CEO and its next four most highly paid executives.  Item 402 requires

26   particularized disclosures involving a company's stock option grants in the last fiscal year.  In the

27   summary compensation table, the issuer must identify in a column "other annual compensation"

28   received by the named executives that is not properly categorized as salary or bonus, including any

1    "[a]bove-market or preferential earnings on restricted stock, options, SARs or deferred

2    compensation" paid to the officer during the period.  Item 402(b)(2)(iii)(C)(2).  In the option grants

3    table, the issuer must identify in a column "[t]he per-share exercise or base price of the options . . . .

4    If such exercise or base price is less than the market price of the underlying security on the date of

5    grant, a separate, adjoining column shall be added showing market price on the date of grant."  Item

6    402(c)(2)(iv).

7          150.    Defendants caused KLA-Tencor to violate SEC Regulations by failing to disclose that

8    the Company's named executive officers had been granted options with exercise prices below the

9    market value on the date the Board or Compensation Committee approved the grant.

10                         **Violations of IRS Rules and Regulations**

11         151.    During the Relevant Period, Defendants further caused KLA-Tencor to violate IRS

12   rules and regulations due to its improper accounting for the backdated stock options.  As a result, the

13   Company's tax liabilities were understated exposing KLA-Tencor to potential amounts owed for

14   back taxes, penalties and interest to the IRS for improperly reporting compensation.

15         152.    Defendants caused the Company to violate IRS Code §162(m) which generally limits

16   a publicly traded company's tax deductions for compensation paid to each of its named executive

17   officers to $1 million unless the pay is determined to be "performance-based."  In order for

18   compensation to be performance-based, the Compensation Committee must have set pre-established

19   and objective performance goals.   The goals must then be approved by the shareholders.

20   Section 162(m) defines stock options as performance-based, provided they are issued at an exercise

21   price that is no less than the fair market value of the stock on the date of the grant.  Accordingly,

22   properly issued stock options do not have to be taken into account in calculating whether an

23   executive's compensation has exceeded the $1 million compensation cap.

24         153.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top

25   executives' soaring pay packages more closely to a company's performance.  This change in the tax

26   law turned compensation practices for a company's top executives away from straight salary-based

27   compensation to performance-based compensation, including stock options.  According to former

28

1   SEC Chairman Harvey Pitt: "What [§162(m)] did was create incentives to find other forms of

2   compensation so people could get over the $1 million threshold without running afoul of the code."

3        154.   Defendants caused KLA-Tencor to violate IRS Code §162(m) by providing

4   backdated options to the Company's named executive officers, which were granted with exercise

5   prices that were less than the fair market value of the stock on the date of the grant.  As a result, all

6   of the income resulting from the exercise of the options must be included for purposes of calculating

7   whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

8        155.   Defendants further caused the Company to violate IRS rules and regulations in order

9   to avoid having to withhold income and FICA ("Federal Insurance Contributions Act") tax from its

10   executives and employees upon the exercise of KLA-Tencor's stock options by improperly

11   accounting for its Non-Qualified Stock Options ("NQSOs") as Incentive Stock Options ("ISOs").

12        156.   ISOs are a form of equity compensation that may be provided to a company's

13   employees.  ISOs are required to be granted at an exercise price that is no less than the fair market

14   value of the stock on the date of the grant, and are entitled to preferential tax treatment as they are

15   not subject to income tax upon exercise of the options but only upon sale of the stock (except for the

16   possible imposition of alternative minimum tax on the option spread at the time of exercise).  Stock

17   options that do not qualify as ISOs are considered to be NQSOs.  NQSOs are not entitled to

18   preferential treatment as they are subject to income tax and FICA withholding upon exercise.  As a

19   result, a company that fails to withhold income tax and/or FICA upon the exercise of NQSOs by its

20   employees would be liable for the amount of the income tax and FICA that the company failed to

21   withhold upon exercise of the options, in addition to interest and penalties.

22        157.   By improperly treating its backdated options as ISOs, Defendants failed to provide

23   proper income tax and FICA withholdings upon the exercise of its options by its executives and

24   employees in violation of IRS rules and regulations.

25   **THE COMPANY REVELATIONS AND ADMISSIONS OF**
     **STOCK OPTION BACKDATING**

26

27        158.   The FY 1995-2005 Proxy Statements concealed Defendants' option backdating

28   scheme.  Thus, the Company's shareholders remained unaware of Defendants' wrongdoing when

1    voting on proxy proposals between 1994 and 2005.  In fact, it was not until *The Wall Street Journal*

2    article that shareholders learned that the Proxy Statements which they had relied upon for nearly a

3    decade were false and misleading.

4        159.    On May 22, 2006, KLA-Tencor's stock dropped when it was mentioned in *The Wall*

5    *Street Journal* article on companies at risk for being involved in the backdating scandal.

6        160.    On May 24, 2006, the Company confirmed that it was a target of DOJ investigations

7    and announced that it had received subpoenas from the U.S. Attorneys' Offices in New York and

8    California.  That same day the Company announced the formation of a Special Committee to

9    investigate stock option practices.  The Form 8-K provided:

10           KLA-Tencor Corporation announced today that its Board of Directors has appointed
             a Special Committee of independent directors to conduct an internal investigation
11           relating to past stock option grants, the timing of such grants and related accounting
             and documentation.  The Special Committee will be assisted by outside legal counsel
12           and accounting experts.  KLA-Tencor also said that it has received subpoenas from
             the U.S. Attorney's Offices for the Eastern District of New York and Northern
13           District of California requesting information relating to its past stock option grants.
             KLA-Tencor said that it will cooperate fully with any government or regulatory
14           investigation into these matters.  KLA-Tencor further disclosed that on May 22,
             2006, it was served with a complaint relating to a lawsuit filed in the United States
15           District Court for the Northern District of California filed by the Theodore R.
             Kornreich Revocable Trust, derivatively on behalf of KLA-Tencor.
16

17       161.    Additionally, as a result of the sharp decline in KLA-Tencor's stock due to its

18   involvement in the ongoing option granting scandal, KLA-Tencor has been forced to renegotiate its

19   deal to acquire ADE.  Initially, on February 23, 2006, KLA-Tencor announced that it had entered

20   into an agreement with ADE to acquire ADE in a stock-for-stock transaction valued at

21   approximately $488 million.  Under the agreement, KLA-Tencor would issue 0.64 share of KLA-

22   Tencor per one share of ADE.  This calculation was based upon the closing price of KLA-Tencor

23   stock for February 22, 2006 of $51.73.  Due to the recent sharp decline of the value of KLA-

24   Tencor's stock, KLA-Tencor was forced to change the terms of its agreement with ADE into an all-

25   cash transaction instead of a stock-for-stock transaction.  On May 26, 2006, KLA-Tencor announced

26   that it had amended its agreement with ADE from a stock-for-stock transaction to an all-cash

27   transaction and that it had agreed to pay $32.50 in cash per share of ADE stock in a transaction

28

valued at approximately $478 million.  KLA-Tencor's stock closed at $40.62 per share on May 26, 2006 – a 21.5% decline from February 22, 2006.

162.     On September 28, 2006, the Company announced an impending restatement of publicly reported financial statements due to the backdating/misdating of stock options:

**KLA-Tencor Will Restate Financial Statements Related to Stock Options**

*SAN JOSE, Calif., September 28, 2006 – KLA-Tencor Corporation (NASDAQ: KLAC) today announced that it will restate previously issued financial statements to correct the Company's past accounting for stock options*.  Based on a report received from a Special Committee of the Board of Directors, *the Board concluded that incorrect measurement dates for certain stock option grants were used for financial accounting purposes, principally during the periods July 1, 1997 through June 30, 2002.  As a result, the Company will be required to record non-cash charges for compensation expenses relating to those past stock option grants*.

The Company has not determined the exact amount of such charges, the resulting tax and accounting impact, or which specific reporting periods may require restatement. *Accordingly, the Company is filing a Form 8-K today stating that the financial statements and all earnings and press releases and similar communications issued by the Company relating to periods beginning on or after July 1, 1997, should no longer be relied upon. KLA-Tencor intends to file its restated financial results and Annual Report on Form 10-K as quickly as practicable*.

KLA-Tencor does not anticipate that the restatement will have any impact on the Company's historical revenues. *Any stock-based compensation charges incurred as a result of the restatement would have the effect of decreasing reported income or increasing reported loss from operations, and decreasing reported net income or increasing reported net loss, and decreasing reported retained earnings amounts contained in the Company's historical financial statements for the affected periods*.

163.     Thereafter, on October 16, 2006, the Company announced that it was immediately terminating all relationships with Schroeder and that it fired its General Counsel, defendant Nichols. On October 17, 2006, the Company announced the retirement of defendant Levy along with the fact that Levy received backdated options and that his options would be repriced.

164.     Finally, as discussed above in ¶¶43-47, on January 29, 2007, the Company filed its Form 10-K for the period ending June 30, 2006 detailing restated financials between 1994-2006 and the specific findings of the Special Committee.

**DERIVATIVE DEMAND FUTILITY ALLEGATIONS**

165.     At the time the first derivative action was commenced, the KLA-Tencor Board consisted of nine directors: Levy, Barnholt, Wallace, Kaufman, Urbanek, Bond, Tompkins, Wang

1    and Bingham.    Eight of these directors are incapable of independently and disinterestedly

2    considering a demand to commence and vigorously prosecute the derivative actions:

3             (a)    Defendants Levy, Tompkins and Wallace are incapable because they received

4    backdated stock options, and they are directly interested in the improperly backdated stock option

5    grants complained of herein, as recipients thereof.  These defendants also sold hundreds of thousands

6    of shares of KLA-Tencor stock for millions of dollars in insider trading proceeds (*see supra*, ¶27);

7             (b)    Bond, Barnholt and Urbanek are incapable because as members of the

8    Compensation Committee, each directly participated in and approved the improper backdating of

9    stock options, as alleged herein or misrepresented and falsely assured the Company shareholders that

10   KLA-Tencor stock options were issued at fair market value on the date of the grant.  They indeed

11   were the Board members who purported but failed to "***review[]. . . the Company's executive***

12   ***compensation policy and administer[] the Company's . . . equity benefit plan***" under which stock

13   options were granted.  Moreover, by colluding with Defendants and others, as alleged herein, Bond,

14   Barnholt and Urbanek have demonstrated that they are unable and unwilling to act independently of

15   Defendants; and

16            (c)    All of the members of the Audit Committee, including Bingham, Bond and

17   Kaufman are incapable because as veteran members of the Audit Committee, they directly

18   participated in and approved the Company's knowing violations of GAAP and IRS Code §162(m),

19   as alleged herein.  Defendant Bingham was represented to shareholders as being a "financial expert,"

20   and has been Chairman of the Audit Committee for the last five years.  Moreover, by colluding with

21   Defendants and others, as alleged herein, Bingham, Bond and Kaufman have demonstrated that they

22   are unable and unwilling to act independently of Defendants.

23            166.   The instant Complaint includes federal securities claims brought under the Exchange

24   Act for violations of §10(b) and Rule 10b-5 promulgated thereunder, and for violations of proxy

25   disclosure requirements under §14(a) of the Exchange Act and Cal. Corp. Code §25402.  Under both

26   federal and Delaware law, proxy disclosure claims are not subject to the pre-suit demand

27   requirement because imposing such a requirement would enable a Board to override federal and

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 62 -

1   Delaware policy requiring full disclosure in all Proxy Statements.  Indeed, the business judgment

2   rule does not apply to proxy disclosure claims.

3          167.    In relation to plaintiffs' other claims, prior demand upon a Board of Directors is

4   excused if plaintiffs allege facts that, if accepted as true, raise a reasonable doubt that: (a) the

5   challenged transaction was the product of a valid business judgment; or (b) a majority of the

6   directors are disinterested and independent.  If either prong of this test is satisfied, demand is

7   excused.

8          168.    By reason of their corporate positions and their ability to control the business and

9   corporate affairs of KLA-Tencor at all relevant times, the directors of KLA-Tencor owed KLA-

10  Tencor and its stockholders fiduciary duties of candor, fidelity, trust, and loyalty, and are and were

11  required to use their ability to control KLA-Tencor in a fair, just and equitable manner, as well as to

12  act in furtherance of the best interests of KLA-Tencor and its stockholders.  In addition, the directors

13  owed KLA-Tencor the fiduciary duty to exercise due care and diligence in the management and

14  administration of the affairs of KLA-Tencor and in the use and prevention of its property and assets.

15  In violation of their fiduciary duties, Defendants approved of and/or caused KLA-Tencor to issue

16  illegally backdated stock options to many of its employees for a period beginning in at least 1995

17  and continuing through 2005.

18        **A Majority of KLA-Tencor's Directors Are Not Independent and Disinterested**

19         169.    A majority of KLA-Tencor's Board are interested and/or incapable of independently

20  evaluating the claims in this lawsuit.  Of the nine members of the Board at the time this action was

21  filed, a majority of them have significant conflicts which would make a demand on the Board futile

22  and useless.  In particular:

23         (a)      Defendant Levy founded KLA Instruments in 1976 and was both Chairman of

24  the Board and CEO of the Company.  Because of these dual roles, Levy is incapable of exercising

25  independent judgment regarding this action.  Levy was Chair of KLA-Tencor's Nominating and

26  Governance Committee from 1997 and continued to serve on the Committee until October 17, 2006.

27  As the Chairman and/or member of the Nominating and Governance Committee, Levy had a

28  responsibility to oversee the Company's nomination of directors and developing and leading

1   corporate governance policies and principles at the Company.  As former Chairman and CEO of

2   KLA-Tencor, Levy stands to earn millions of dollars in retirement and severance compensation, all

3   of which must be approved by the current members of the Compensation Committee.  Though the

4   Company has repriced Levy's backdated options, it has not indicated that it will recover bonuses and

5   insider trading proceeds obtained in part by falsifying the Company's financial statements.  Indeed,

6   through the falsification of the Company's financial statements and, based upon his knowledge of

7   material non-public information regarding the Company, Levy has made over ***$111 million*** through

8   his sales of Company stock.  In addition, Levy is a director and a named defendant in *In re Juniper*

9   *Derivative Actions*, No. 5:06-cv-03396-JW, wherein he is alleged to have backdated stock options.

10  Juniper admitted on December 21, 2006 that it will restate ***$900 million*** in compensation expenses

11  due to improperly backdated stock options between 1997 and 2003.  Levy grossly abandoned his

12  fiduciary duties and betrayed KLA-Tencor and its shareholders by knowingly approving and/or

13  directing that Company directors and officers manipulate the grant date of stock options.

14  Accordingly, Levy is incapable of independently and disinterestedly considering a demand to

15  commence and vigorously prosecute the above-captioned action against Defendants;

16          (b)     Defendant Levy himself received backdated/misdated option grants.  Further,

17  Levy faces a significant likelihood of criminal and/or civil prosecution from his participation in, and

18  direction of, this fraudulent and illegal scheme.  There can be no doubt that these conflicts make

19  Levy interested in these transactions, and completely incapable of exercising independent judgment

20  regarding this lawsuit;

21          (c)     Defendant Bond has served as a director of the Company since 1997.

22  Between 2000 and 2005, Bond was a member of the Compensation Committee responsible for

23  reviewing and making recommendations to the Board concerning stock option issuances for certain

24  executive officers and certain employees.  During the Relevant Period, Bond represented that the

25  Compensation Committee reviewed and recommended individual options grants to the Board, taking

26  into account the officer's scope of responsibility and specific assignments, strategic and operational

27  goals applicable to the officer, anticipated performance requirements and contributions of the officer,

28  and the number of options previously granted to the officer.  Moreover, Bond falsely confirmed in

1   Compensation Committee reports that stock option grants were made at the fair market value on the

2   date of the grant. These statements and assertions were knowingly false because Bond either: (i)

3   knew that KLA-Tencor granted options inconsistent with publicly disclosed policies or without any

4   approval or review by the Compensation Committee or the Board; or (ii) knew that KLA-Tencor's

5   Compensation Committee had illegally backdated option grants to increase their value to the

6   grantees contrary to the requirements of KLA-Tencor's Stock Option Plans. Accordingly, Bond

7   ignored his fiduciary duties to KLA-Tencor, and deliberately or recklessly materially misrepresented

8   the level of review and oversight that the Compensation Committee provided. Further, Bond also

9   has served on KLA-Tencor's Audit Committee from at least 2003 to 2005 and represented that the

10  Audit Committee provided oversight regarding the integrity of the Company's financial statements,

11  the Company's compliance with legal and regulatory requirements, and the Company's internal

12  accounting and financial controls. As a member of the Audit Committee, Bond had a special duty to

13  know and understand the material information regarding the stock option grants as it affected the

14  Company's financial statements as provided for in the Audit Committee's charter. Accordingly,

15  Bond knew or should have known that KLA-Tencor's financial statements were inaccurate and that

16  certain stock option grants were improperly accounted for. Nonetheless, Bond permitted and/or

17  condoned the unlawful practices described herein, including preparing false reports in the

18  Company's Proxy Statements and annual reports and interim financial reports which did not disclose

19  this egregious practice. Bond knew or deliberately disregarded that the Company had failed to

20  disclose material weaknesses in its financial statements and internal controls and specifically

21  misrepresented the Company's compliance with GAAP and APB Opinion No. 25. Because Bond

22  either knew that KLA-Tencor had (a) backdated options without reporting the cost of such options in

23  KLA-Tencor's Proxy Statements or financial filings; or (b) allowed the backdating of options to

24  occur unchecked by failing to exercise adequate oversight over KLA-Tencor's financial reporting,

25  Bond ignored his fiduciary duties to KLA-Tencor, and deliberately misrepresented the level of

26  review and oversight that the Audit Committee provided.

27          (d)     Because of Bond's lack of due care with respect to his duties on the Audit

28  Committee, KLA-Tencor has suffered tremendous damages from this scandal. Bond either knew

1  that backdating was occurring on a systematic basis, or allowed for the waste of millions of dollars

2  of corporate assets by failing to provide the necessary oversight that could have prevented the

3  widespread manipulation of KLA-Tencor's Stock Option Plans.  As a result, Bond could not

4  objectively consider a demand in this matter.

5           (e)     Defendant Kaufman has been a director of KLA-Tencor since 2002.  Kaufman

6  has served on KLA-Tencor's Audit Committee since 2003.  During the Relevant Period, Kaufman

7  represented that the Audit Committee provided oversight regarding the integrity of the Company's

8  financial statements, the Company's compliance with legal and regulatory requirements, and the

9  Company's internal accounting and financial controls.  As a member of the Audit Committee,

10  Kaufman had a special duty to know and understand the material information regarding the stock

11  option grants as it affected the Company's financial statements as provided for in the Audit

12  Committee's charter.  Accordingly, Kaufman knew or should have known that KLA-Tencor's

13  financial statements were inaccurate and that certain stock option grants were improper.

14  Nonetheless, Kaufman permitted and/or condoned the unlawful practices described herein, including

15  preparing false reports in the Company's Proxy Statements and annual reports and interim financial

16  reports which did not disclose this egregious practice.  Accordingly, Kaufman knew or should have

17  known that KLA-Tencor's financial statements were false and certain stock options granted were

18  improperly accounted for.  Kaufman knew or deliberately disregarded that the Company had failed

19  to disclose material weaknesses in its financial statements and internal controls and specifically

20  misrepresented the Company's compliance with APB Opinion No. 25 and that KLA-Tencor had

21  backdated options without reporting the cost of such options in KLA-Tencor's Proxy Statements or

22  financial filings.  Alternatively, Kaufman allowed the backdating of options to occur unchecked by

23  failing to exercise adequate oversight over KLA-Tencor's financial reporting.  In either respect,

24  Kaufman ignored his fiduciary duties to KLA-Tencor, and deliberately misrepresented the level of

25  review and oversight that the Audit Committee provided.

26           (f)     Because of Kaufman's lack of due care with respect to his duties on the Audit

27  Committee, KLA-Tencor has suffered tremendous damages from this scandal. Kaufman either knew

28  that backdating was occurring on a systematic basis, or allowed for the waste of millions of dollars

1   of corporate assets by failing to provide the necessary oversight that could have prevented the blatant

2   and widespread manipulation of KLA-Tencor's Stock Option Plans.  As a result Kaufman could not

3   objectively consider a demand in this matter;

4            (g)      Defendant Barnholt has been a director of KLA-Tencor since 2001.  Barnholt

5   has served on KLA-Tencor's Compensation Committee since 2003.  During the Relevant Period,

6   Barnholt represented that the Compensation Committee reviewed option grants to KLA-Tencor

7   officers, and that the Compensation Committee approved and made recommendations to the Board

8   concerning incentive compensation for executive officers and employees.  These statements and

9   assertions were false because Barnholt either knew that KLA-Tencor had granted options

10  inconsistent with the Stock Option Plans and/or knew that the KLA-Tencor Compensation

11  Committee or the Board was illegally backdating option grants to increase their value to the grantees

12  contrary to the requirements of KLA-Tencor's Stock Option Plans.  In either respect, Barnholt

13  ignored fiduciary duties to KLA-Tencor and deliberately misrepresented the level of review and

14  oversight that the Compensation Committee provided.  Barnholt cannot be independent and

15  disinterested in litigation that so directly implicates his abdication of his fiduciary duties.  Because of

16  Barnholt's lack of due care with respect to his duties on the Compensation Committee, KLA-Tencor

17  has suffered tremendous damages from this scandal.  Barnholt either knew that backdating was

18  occurring on a systematic basis, or allowed for the waste of millions of dollars of corporate assets by

19  failing to provide the necessary oversight that could have prevented the blatant and widespread

20  manipulation of KLA-Tencor's Stock Option Plans;

21           (h)      Defendant Bingham has been a director since 1999 and has served on KLA-

22  Tencor's Audit Committee from at least 2001 through 2005.  During the Relevant Period, Bingham

23  represented that the Audit Committee provided oversight as provided in the Audit Committee

24  Charter regarding the integrity of the Company's financial statements, the Company's compliance

25  with legal and regulatory requirements, and the Company's internal accounting and financial

26  controls.  As a member of the Audit Committee, Bingham had a special duty to know and understand

27  the material information regarding the stock option grants as it affected the Company's financial

28  statements as provided for in the Audit Committee's charter.  Accordingly, Bingham knew or should

1  have known that KLA-Tencor's financial statements were inaccurate and that certain stock option

2  grants were improperly accounted for.   Nonetheless, Bingham permitted and/or condoned the

3  unlawful practices described herein, including preparing false reports in the Company's Proxy

4  Statements and annual reports and interim financial reports which did not disclose this egregious

5  practice.  These statements and assertions were false because Bingham either: (i) knew that KLA –

6  Tencor had in fact awarded backdated options without reporting the cost of such options in KLA-

7  Tencor's Proxy Statements or financial filings; or (ii) allowed the backdating of options to occur

8  unchecked by failing to exercise adequate oversight over KLA-Tencor's financial reporting.  In

9  either respect, Bingham ignored his fiduciary duties to KLA-Tencor, and deliberately misrepresented

10  the level of review and oversight that the Audit Committee provided;

11          (i)     Defendant Wallace has been a director of KLA-Tencor since November 16,

12  2005.  Defendant Wallace served as the Company's President and COO in 2005 and 2006.  Further,

13  during the Relevant Period, apart from receiving backdated stock options, Wallace sold 292,449

14  shares of KLA-Tencor stock for insider trading proceeds of $15.5 million.

15          (j)     Defendant Urbanek has been a director of KLA-Tencor since 1997 and has

16  served on KLA-Tencor's Compensation Committee since 1997.   During the Relevant Period

17  Urbanek represented that the Compensation Committee reviewed option grants to KLA-Tencor

18  officers, and made recommendations to the Board concerning incentive compensation for executive

19  officers and employees.  These statements and assertions were false because Urbanek either: (i)

20  knew that KLA-Tencor had issued stock options inconsistent with the Stock Option Plans which

21  provided that stock options were granted at fair market value on the grant date; or (ii) knew that the

22  Company's Board was backdating option grants to increase their value to the grantees contrary to the

23  requirements of KLA-Tencor's Stock Option Plans.  In either respect, she ignored her fiduciary

24  duties to KLA-Tencor, and deliberately or recklessly misrepresented the level of review and

25  oversight that the Compensation Committee provided.  Urbanek cannot be independent and

26  disinterested in litigation that so directly implicates her abdication of her fiduciary duties.  Because

27  of Urbanek's lack of due care with respect to her duties on the Compensation Committee, KLA-

28  Tencor has suffered tremendous damages from this scandal.  Urbanek either knew that backdating

1    was occurring on a systematic basis, or allowed for the waste of millions of dollars of corporate

2    assets by failing to provide the necessary oversight that could have prevented the blatant and

3    widespread manipulation of KLA-Tencor's Stock Option Plans.

4            (k)    Defendant Tompkins has served as a director since 1997 and served as

5    Chairman of the Board from July 1997 to June 1999.  He also served as CEO of the Company from

6    May 1997 to July 1998.  He was a member of KLA-Tencor's Nominating and Governance

7    Committee in 1998, and as a member, he had a duty to oversee the Company's nomination of

8    directors, and a duty to develop corporate governance polices and lead with respect to those policies.

9    Because of Tompkins' positions, he knew the adverse non-public information about the business of

10   the Company, as well as its finances, markets and present and future business prospects, via access

11   to internal corporate documents, conversations and connections with other corporate officers and

12   employees, attendance at Board meetings and committees thereof and via reports and other

13   information provided to him in connection therewith.  Tompkins received backdated/misdated

14   options and based on his knowledge of material non-public information regarding the Company,

15   Tompkins violated Cal. Corp. Code §§25402 and 25502.5 by selling shares of KLA-Tencor stock for

16   proceeds of $31.5 million during the Relevant Period.

17   **Options Backdating Is Not the Product of Business Judgment Because It Is *Ultra Vires*,**
     **Illegal, and Contrary to the Stated Purpose of the Stock Option Plans**

18

19           170.    The practice of granting illegal and backdated stock options is not protected by the

20   business judgment rule because it is *ultra vires*.  The various stock option plans under which these

     options were purportedly given, and the Proxy Statements disclosing grants to senior executives and

21   directors during this time period, all represented and required that the stock grants in question be

22   priced based on the fair market value of KLA-Tencor stock on the day of the grant.

23
             171.    However, contrary to this limited authority given to the Board by KLA-Tencor's
24
     Stock Option Plans, and contrary to KLA-Tencor's representations in the proxy filings, by KLA-
25
     Tencor's own admission, ***most*** of KLA-Tencor's option grants between 1997 and 2002 were priced
26
     at a date earlier than the actual date on which they were granted.  Further, such conduct caused the
27
     Company's financial statements for nearly a decade to be false and misleading.  Because granting
28

1    options using manipulated grant dates to lower the strike price of the options is not permitted by the

2    Stock Option Plans, this conduct is *ultra vires* and void on its face. *Ultra vires* acts are not protected

3    by the business judgment rule, and thus demand is excused.

4         172.    Additionally, Defendants' conduct caused KLA-Tencor to issue materially false

5    financial reports and Proxy Statements for the entirety of the period in question, in violation of

6    numerous provisions of the federal securities laws. Each Defendant violated §10(b) and Rule 10b-5

7    of the Exchange Act by participating in this fraudulent scheme. Each director violated §14(a) of the

8    Exchange Act by issuing false and misleading Proxy Statements from 1995 to 2005. And each

9    director violated §20(a) of the Exchange Act by being controlling persons of KLA-Tencor and

10   engaging in the purchase and/or sale of KLA-Tencor stock while in the possession of material non-

11   public information regarding KLA-Tencor's backdating scheme. Demand is excused because these

12   are illegal acts that are not protected by the business judgment rule.

13        173.    Even if stock option backdating was not illegal, *ultra vires*, and void, there would be

14   no plausible argument that backdating stock options was a valid exercise of business judgment. As

15   represented in KLA-Tencor's Proxy Statements, the stated purpose of KLA-Tencor's Stock Option

16   Plans is to encourage the productivity of KLA-Tencor employees by providing compensation that is

17   proportional to gains in KLA-Tencor's stock price. However, by granting options with backdated

18   strike prices, Defendants undermined the purpose of the Stock Option Plans which was to incentivize

19   grant recipients to commit to the advancement of the Company's stock price thereby aligning the

20   interest of the employees with that of the Company. In effect, this practice was nothing more than

21   secret handouts to executives and employees at the expense of unsuspecting shareholders and the

22   market at large.

23        174.    Defendants could have achieved the stated purpose of attracting and retaining

24   qualified employees by granting those employees additional options under their incentive plans, or

25   by granting options at a price less than the fair market value on the day of the grant and simply

26   disclosing and expensing these grants. Instead, Defendants intentionally concealed these known

27   grants and illegally reported these grants in their financial disclosures to improve their bottom line.

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 70 -

1    175.   Further, the practice of backdating stock options could not have been a valid exercise

2 of business judgment because it has subjected KLA-Tencor to potentially massive liability.  KLA-

3 Tencor has disclosed that it will have to restate financial statements for several past periods.  The

4 Company's practices are being investigated by the SEC and DOJ.  The Company will likely suffer

5 tax liabilities for the additional compensation they will have to expense, and they have tarnished

6 their reputation in the investment community through this deliberate and calculated conduct.  In

7 addition, the Company has already had to pay millions of dollars to keep their creditors at bay until

8 they are able to file their most recent Form 10-Q.

9    176.   In particular, demand would be a futile and useless act for the following reasons:

10          (a)   A majority of the current KLA-Tencor Board participated in or approved

11 many of the acts and omissions or were on notice of and/or recklessly disregarded the wrongs

12 complained of herein;

13          (b)   KLA-Tencor's Board ultimately had to approve all option grants.  Some of the

14 directors themselves received options by virtue of their employment at KLA-Tencor that were likely

15 backdated;

16          (c)   Regardless of whether any individual director received a backdated grant, all

17 of KLA-Tencor's directors benefited from the option backdating because it allowed KLA-Tencor to

18 overstate its profits and understate its compensation expenses for the years in question.  Thus, every

19 time the directors exercised KLA-Tencor stock options – backdated or not – they were doing so with

20 knowledge that KLA-Tencor's stock price was illegally overstated because of their approval of, or

21 acquiescence to, these fraudulent practices.  They have thus benefited from the wrongdoing herein

22 alleged, and are incapable of exercising independent objective judgment in deciding whether to bring

23 this action;

24          (d)   The acts complained of herein constitute violations of law and breaches of the

25 fiduciary duties owed by KLA-Tencor's Board, and these acts are incapable of ratification;

26          (e)   In order to bring this action for breaching their fiduciary duties, the members

27 of the KLA-Tencor Board would have been required to sue themselves and/or their fellow directors

28 and allies in the top ranks of the Company, who are their good friends and with whom they have

1    entangling financial alliances, interests and dependencies, which they would not do. Therefore,

2    Defendants would not be able to vigorously prosecute any such action;

3             (f)      The composition of KLA-Tencor's Board is designed to (and does) make

4    them dependent on and deferential to the top officers of the Company and Chairman of the Board

5    who, as a practical matter, control and dominate the process by which directors are selected for

6    nomination or renomination to the Board;

7             (g)      If KLA-Tencor's current and past officers and directors are protected against

8    personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this

9    Complaint by directors' and officers' liability insurance, they caused the Company to purchase that

10    insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of

11    KLA-Tencor. However, due to certain changes in the language of directors' and officers' liability

12    insurance policies in the past several years, the directors' and officers' liability insurance policies

13    covering Defendants in this case contain provisions which eliminate coverage for any action brought

14    directly by KLA-Tencor against these Defendants, known as, *inter alia*, the "insured versus insured

15    exclusion." As a result, if these directors were to sue themselves or certain of the officers of KLA-

16    Tencor, there would be no directors' and officers' insurance protection and thus, this is a further

17    reason why they would not bring such a suit. On the other hand, if the suit is brought derivatively, as

18    this action is brought, such insurance coverage exists and will provide a basis for the Company to

19    effectuate a recovery. If there is no directors' and officers' liability insurance at all, then Defendants

20    will not cause KLA-Tencor to sue them, since they will face a large uninsured liability.

21       177.     Because plaintiffs can show a reasonable doubt that a majority of KLA-Tencor's

22    directors at the time of suit were disinterested and independent at the time of suit, and because the

23    challenged transaction was clearly not the product of a valid business judgment, a demand upon

24    KLA-Tencor's Board would be futile and is excused.

25       178.     Plaintiffs have not made any demand on shareholders of KLA-Tencor to institute this

26    action since such demand would be a futile and useless act for the following reasons:

27             (a)      KLA-Tencor is a publicly traded Company with approximately 199 million

28    shares outstanding, and thousands of shareholders;

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 72 -

1        (b)     Making a demand on such a number of shareholders would be impossible for

2   plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders;

3   and

4        (c)     Making a demand on all shareholders would force plaintiffs to incur huge

5   expenses, assuming all shareholders could be individually identified.

6                            **TOLLING OF THE STATUTE OF LIMITATIONS**

7        179.    The Counts alleged herein are timely.  As an initial matter, Defendants wrongfully

8   concealed their manipulation of the stock option plans, through strategic timing and fraudulent

9   backdating, by issuing false and misleading Proxy Statements, by falsely reassuring KLA-Tencor's

10  public investors that KLA-Tencor's option grants were being administered by a committee of

11  independent directors, and by failing to disclose that backdated options were, in fact, actually issued

12  on dates other than those disclosed, and that strategically timed option grants were issued based on

13  the manipulation of insider information that ensured that the true fair market value of the Company's

14  stock was, in fact, higher than the publicly traded price on the date of the option grant.

15       180.    KLA-Tencor's public investors had no reason to know of the Defendants' breach of

16  their fiduciary duties until May 2006, when *The Wall Street Journal* published its article detailing

17  the option practices of KLA-Tencor and other companies.

18       181.    Finally, as fiduciaries of KLA-Tencor and its public shareholders, the Defendants

19  cannot rely on any limitations defense where they withheld from KLA-Tencor's public shareholders

20  the facts that give rise to the claims asserted herein, *i.e.,* that the KLA-Tencor Board had abdicated

21  its fiduciary responsibilities to oversee the Company's executive compensation practices, and that

22  the option grant dates had been manipulated to maximize the profit for the grant recipients and,

23  accordingly, to maximize the costs for the Company.

24                                          **COUNT I**

25                  **Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**
                                    **Against All Defendants**
26

27       182.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

28  above, as though fully set forth herein.

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 73 -

183.   Throughout the Relevant Period, Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to divert hundreds of millions of dollars to Defendants via improper option grants.

184.   Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about KLA-Tencor not misleading.

185.   Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by KLA-Tencor.

186.   Defendants acted with scienter throughout the Relevant Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

187.   Each of the Defendants participated in a scheme to defraud with the purpose and effect of defrauding KLA-Tencor.

188.   By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

1

**COUNT II**

2

**Violations of Section 14(a) of the Exchange Act Against**
**All Defendants**

3

4

189.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

above, as though fully set forth herein.

5

6

190.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no

7

Proxy Statement shall contain "any statement which, at the time and in the light of the circumstances

8

under which it is made, is false or misleading with respect to any material fact, or which omits to

9

state any material fact necessary in order to make the statements therein not false or misleading."

10

17 C.F.R. §240.14a-9.

11

191.    The FY 1995-2005 Proxy Statements violated §14(a) and Rule 14a-9 because they

12

omitted material facts, including the fact that Defendants were causing KLA-Tencor to engage in an

13

options backdating scheme, a fact which Defendants were aware of and participated in from at least

1994.

14

15

192.    In the exercise of reasonable care, Defendants should have known that the Proxy

16

Statements were materially false and misleading.

17

193.    The misrepresentations and omissions in the Proxy Statements were material to

18

plaintiffs in voting on each Proxy Statement.  The Proxy Statements were an essential link in the

19

accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as

20

revelations of the truth would have immediately thwarted a continuation of shareholders'

21

endorsement of the directors' positions, the executive officers' compensation and the Company's

22

compensation policies.

23

194.    The Company was damaged as a result of the material misrepresentations and

24

omissions in the Proxy Statements.

25

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 75 -

1

**COUNT III**

2

**Violations of Section 20(a) of the Exchange Act Against**
**Defendants Levy, Schroeder, Wallace, Kispert, Hall, Tompkins,**
**Urbanek, Bingham, Bond, Barnholt and Kaufman**

3

4      195.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

5   above, as though fully set forth herein.

6      196.    Plaintiffs bring this claim against defendants Levy, Schroeder, Wallace, Kispert, Hall,

7   Tompkins, Urbanek, Bingham, Bond, Barnholt and Kaufman.

8      197.    Defendants named in this Count, by virtue of their positions with KLA-Tencor and

9   their specific acts, were, at the time of the wrongs alleged herein, controlling persons of KLA-

10  Tencor within the meaning of §20(a) of the Exchange Act.  They had the power and influence and

11  exercised the same to cause KLA-Tencor to engage in the illegal conduct and practices complained

12  of herein.

13

**COUNT IV**

14

**Accounting**

15     198.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

16  above, as though fully set forth herein.

17     199.    At all relevant times, Defendants, as directors and/or officers of KLA-Tencor, owed

18  the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

19     200.    In breach of their fiduciary duties owed to KLA-Tencor and its shareholders, the

20  Defendants caused KLA-Tencor, among other things, to grant backdated stock options to themselves

21  and/or certain other officers and directors of KLA-Tencor.  By this wrongdoing, Defendants

22  breached their fiduciary duties owed to KLA-Tencor and its shareholders.

23     201.    Defendants possess complete and unfettered control over their improperly issued

24  stock option grants and the books and records of the Company concerning the details of such

25  improperly backdated stock option grants to Defendants.

26     202.    As a result of Defendants' misconduct, KLA-Tencor has been substantially injured

27  and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of

28  those improperly granted options which have been exercised and sold.

1    203.    Plaintiffs demand an accounting be made of all stock options grants made to

2    Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the

3    value of the grants, the recipients of the grants, the exercise date of stock options granted to

4    Defendants, as well as the disposition of any proceeds received by Defendants via sale or other

5    exercise of backdated stock option grants received by Defendants.

6                                    **COUNT V**

7         **Breach of Fiduciary Duty and/or Aiding and Abetting Against All Defendants**

8    204.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

9    above, as though fully set forth herein.

10    205.    Each of Defendants agreed to and did participate with the other Defendants and/or

11    aided and abetted one another in a deliberate course of action designed to divert corporate assets in

12    breach of the fiduciary duties Defendants owed to the Company.

13    206.    Defendants have violated fiduciary duties of care, loyalty, candor and independence

14    owed to KLA-Tencor and its public shareholders, have engaged in unlawful self-dealing and have

15    acted to put their personal interests and/or their colleagues' interests ahead of the interests of KLA-

16    Tencor and its shareholders.

17    207.    As demonstrated by the allegations above, Defendants failed to exercise the care

18    required, and breached their duties of loyalty, good faith, candor and independence owed to KLA-

19    Tencor and its public shareholders, and they failed to disclose material information and/or made

20    material misrepresentations to shareholders regarding Defendants' options backdating scheme.

21    208.    By reason of the foregoing acts, practices and course of conduct, Defendants have

22    failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward

23    KLA-Tencor and its public shareholders.

24    209.    As a proximate result of Defendants' conduct, KLA-Tencor has been injured and is

25    entitled to damages.

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW    - 77 -

1

**COUNT VI**

2

**Abuse of Control Against All Defendants**

3          210.     Plaintiffs incorporate by reference and reallege each and every allegation set forth

4    above, as though fully set forth herein.

5          211.     Defendants employed the alleged scheme for the purpose of maintaining and

6    entrenching themselves in their positions of power, prestige and profit at, and control over, KLA-

7    Tencor, and to continue to receive the substantial benefits, salaries and emoluments associated with

8    their positions at KLA-Tencor.   As a part of this scheme, Defendants actively made and/or

9    participated in the making of or aided and abetted the making of, misrepresentations regarding KLA-

10   Tencor.

11         212.     Defendants' conduct constituted an abuse of their ability to control and influence

12   KLA-Tencor.

13         213.     By reason of the foregoing, KLA-Tencor has been damaged.

14

**COUNT VII**

15

**Gross Mismanagement Against All Defendants**

16         214.     Plaintiffs incorporate by reference and reallege each and every allegation set forth

17   above, as though fully set forth herein.

18         215.     Defendants had a duty to KLA-Tencor and its shareholders to prudently supervise,

19   manage and control the operations, business and internal financial accounting and disclosure controls

20   of KLA-Tencor.

21         216.     Defendants, by their actions and by engaging in the wrongdoing described herein,

22   abandoned and abdicated their responsibilities and duties with regard to prudently managing the

23   businesses of KLA-Tencor in a manner consistent with the duties imposed upon them by law.  By

24   committing the misconduct alleged herein, Defendants breached their duties of due care, diligence

25   and candor in the management and administration of KLA-Tencor's affairs and in the use and

26   preservation of KLA-Tencor's assets.

27         217.     During the course of the discharge of their duties, Defendants knew or recklessly

28   disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants

1  caused KLA-Tencor to engage in the scheme complained of herein which they knew had an

2  unreasonable risk of damage to KLA-Tencor, thus breaching their duties to the Company.  As a

3  result, Defendants grossly mismanaged KLA-Tencor.

4      218.    By reason of the foregoing, KLA-Tencor has been damaged.

5                          **COUNT VIII**

6                **Constructive Fraud Against All Defendants**

7      219.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

8  above, as though fully set forth herein.

9      220.    As corporate fiduciaries, Defendants owed to KLA-Tencor and its shareholders a duty

10 of candor and full accurate disclosure regarding the true state of KLA-Tencor's business and assets

11 and their conduct with regard thereto.

12     221.    As a result of the conduct complained of, Defendants made, or aided and abetted the

13 making of, numerous misrepresentations to and/or concealed material facts from KLA-Tencor's

14 shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of

15 KLA-Tencor.  Thus they have committed constructive fraud and violated their duty of candor.

16     222.    By reason of the foregoing, KLA-Tencor has been damaged.

17                          **COUNT IX**

18                **Corporate Waste Against All Defendants**

19     223.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

20 above, as though fully set forth herein.

21     224.    By failing to properly consider the interests of the Company and its public

22 shareholders, by failing to conduct proper supervision, by giving away millions of dollars to

23 Defendants via the options backdating scheme, Defendants have caused KLA-Tencor to waste

24 valuable corporate assets.

25     225.    As a result of Defendants' corporate waste, they are liable to the Company.

26

27

28

**COUNT X**

**Unjust Enrichment Against All Defendants**

226. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

227. As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of KLA-Tencor, in the form of unjustified salaries, benefits, bonuses, stock option grants and other emoluments of office.

228. Certain Defendants also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up Defendants' complicity in the scheme.

229. All the payments and benefits provided to Defendants were at the expense of KLA-Tencor. The Company received no benefit from these payments. KLA-Tencor was damaged by such payments.

230. Certain of the Defendants sold KLA-Tencor stock for a profit during the period of deception, misusing confidential non-public corporate information. These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of KLA-Tencor. A constructive trust for the benefit of the Company should be imposed thereon.

**COUNT XI**

**Against the Officer Defendants for Rescission**

231. Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

232. As a result of the acts alleged herein, the stock option contracts between the Officer Defendants and KLA-Tencor entered into during the Relevant Period were obtained through Defendants' fraud, deceit, and abuse of control. Further, the backdated stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Officer Defendants' employment agreements and the Company's Stock Option Plan which was also approved by KLA-Tencor shareholders and filed with the SEC.

233. All contracts which provide for stock option grants between the Officer Defendants and KLA-Tencor and were entered into during the Relevant Period should, therefore, be rescinded,

with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XII

**Against the Insider Selling Defendants for Violation of
California Corporations Code Section 25402**

234.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

235.    At the time that the Insider Selling Defendants sold their KLA-Tencor common stock as set forth herein at ¶27, by reason of their high executive and/or directorial positions with KLA-Tencor, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of KLA-Tencor's improper accounting.

236.    At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of KLA-Tencor shares at that time.

237.    The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their KLA-Tencor common stock in California in violation of Cal. Corp. Code §25402.

238.    Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants, and each of them, are liable to KLA-Tencor for damages in an amount up to three times the difference between the price at which KLA-Tencor common stock was sold by these Defendants, and each of them, and the market value which KLA-Tencor common stock would have had at the time of the sale if the information known to these Defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT XIII**

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

239.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

240.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold KLA-Tencor common stock on the basis of such information.

241.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold KLA-Tencor common stock.

242.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of KLA-Tencor common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

243.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand judgment as follows:

A.    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 82 -

1   C.  Directing KLA-Tencor to take all necessary actions to reform and improve its

2 corporate governance and internal control procedures to comply with applicable law, including, but

3 not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's

4 By-Laws or Articles of Incorporation and taking such other action as may be necessary to place

5 before shareholders for a vote adoption of the following Corporate Governance Policies:

6     (i)  a proposal requiring that the office of CEO of KLA-Tencor and

7 Chairman of the KLA-Tencor Board be permanently held by separate individuals and that the

8 Chairman of the KLA-Tencor Board meets rigorous "independent" standards;

9     (ii)  a proposal to strengthen the KLA-Tencor Board's supervision of

10 operations and develop and implement procedures for greater shareholder input into the policies and

11 guidelines of the Board;

12     (iii)  appropriately test and then strengthen the internal audit and control

13 functions;

14     (iv)  rotate independent auditing firms every five years;

15     (v)  control and limit insider stock selling and the terms and timing of

16 stock option grants; and

17     (vi)  reform executive compensation.

18   D.  Ordering the imposition of a constructive trust over Defendants' stock options and

19 any proceeds derived therefrom;

20   E.  Awarding punitive damages;

21   F.  Awarding costs and disbursements of this action, including reasonable attorneys',

22 accountants', and experts' fees; and

23   G.  Granting such other and further relief as this Court may deem just and proper.

24

25

26

27

28

1

**JURY DEMAND**

2

       Plaintiffs demand a trial by jury.

3

DATED:  February 20, 2007               LERACH COUGHLIN STOIA GELLER
                                       RUDMAN & ROBBINS LLP

4

                                SHAWN A. WILLIAMS
                                MONIQUE C. WINKLER

5

                                AELISH M. BAIG

6

7

                                          /s/Shawn A. Williams
                                  SHAWN A. WILLIAMS

8

9

                                100 Pine Street, Suite 2600
                                San Francisco, CA  94111
                                Telephone:  415/288-4545

10

                                415/288-4534 (fax)

11

                                LERACH COUGHLIN STOIA GELLER
                                       RUDMAN & ROBBINS LLP

12

                                TRAVIS E. DOWNS III
                                BENNY C. GOODMAN III

13

                                655 West Broadway, Suite 1900
                                San Diego, CA  92101-3301

14

                                Telephone:  619/231-1058
                                619/231-7423 (fax)

15

                                LERACH COUGHLIN STOIA GELLER

16

                                         RUDMAN & ROBBINS LLP
                                THOMAS WILHELM

17

                                9601 Wilshire Blvd., Suite 510
                                Los Angeles, CA  90210

18

                                Telephone:  310/859-3100
                                310/278-2148 (fax)

19

                                Lead Counsel for Plaintiffs

20

T:\CasesSF\KLA-Tencor Derivative\CPT00039317.doc

21

22

23

24

25

26

27

28

AMENDED CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS - C-06-03445-JW     - 84 -

1

<u>VERIFICATION</u>

2       I, SHAWN A. WILLIAMS, hereby declare as follows:

3       2.      I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins,

4 LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing Complaint and

5 know the contents thereof. I am informed and believe the matters therein are true and on that ground

6 allege that the matters stated therein are true.

7       3.      I make this Verification because plaintiff is absent from the County of San Francisco

8 where I maintain my office.

9       Executed this 20th day of February 2007 at San Francisco, California.

10

11                              /s/Shawn A. Williams
                                 SHAWN A. WILLIAMS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 20, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

/s/Shawn A. Williams

SHAWN A. WILLIAMS

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:ShawnW@lerachlaw.com

# Mailing Information for a Case 5:06-cv-03445-JW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Christopher J. Banks**
  cbanks@morganlewis.com

- **Paul F. Bennett**
  pfb@gbcslaw.com cgw@gbcslaw.com

- **Miles F. Ehrlich**
  miles@ramsey-ehrlich.com milesmf@yahoo.com

- **Joseph Edward Floren**
  jfloren@morganlewis.com rluke@morganlewis.com

- **Geoffrey M. Johnson**
  gjohnson@scott-scott.com aslaughter@scott-scott.com

- **Craig D Martin**
  cmartin@mofo.com

- **Leigh A. Parker**
  info@wllawca.com lparker@wllawca.com

- **Warrington S. Parker, III**
  wparker@hewm.com
  tchurch@hewm.com;kim.sydorak@hellerehrman.com

- **David Priebe**
  david.priebe@dlapiper.com stacy.murray@dlapiper.com

- **Patrick David Robbins**
  probbins@shearman.com

- **David R. Scott**

drscott@scott-scott.com

- **Arthur L. Shingler, III**
  ashingler@scott-scott.com ssawyer@scott-scott.com

- **Benjamin P. Smith**
  bpsmith@morganlewis.com ewoodward@morganlewis.com

- **Robert P. Varian**
  rvarian@orrick.com

- **Shirli Fabbri Weiss**
  shirli.weiss@dlapiper.com

- **Shawn A. Williams**
  shawnw@lerachlaw.com
  e_file_sd@lerachlaw.com;e_file_sf@lerachlaw.com;aelishb@lerachlaw.c

- **Denise V. Zamore**
  dzamore@scott-scott.com cmcgowan@scott-scott.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`